Chief Judge DiFiore
(dissenting). Under the public trust doctrine, parkland in our State is dedicated to public use, and can only be alienated for non-park purposes if expressly autho *441 rized by the state legislature. Our Court’s jurisprudence demonstrates unwavering support for the public trust doctrine. In such cases as Williams v Gallatin (229 NY 248 [1920]) and Friends of Van Cortlandt Park v City of New York (95 NY2d 623 [2001]), we held that the contemplated use of parkland for other than a “park use” violated the public trust doctrine. Notably, in those cases, the legislature had not expressly authorized non-park use, and it was up to us to uphold the public trust and determine “what is and is not a park purpose” (Union Sq. Park Community Coalition, Inc. v New York City Dept. of Parks & Recreation, 22 NY3d 648, 655 [2014]).
This case is different. Here, the legislature has spoken and directly and specifically authorized non-park uses of the property, as codified in Administrative Code of the City of New York § 18-118. Indeed, the specific parcel at issue, Willets West, presently covered in asphalt, is being used as a parking lot. Once the state legislature alienates parkland for non-park purposes and expressly authorizes development on parkland, as it has done here, our only role is to ensure that the proposed development comports with the authorization expressed in the statute. We may not second-guess the legislature and such matters as the utility of the development, its aesthetics, or its benefit to the public are beyond our review. Rather, the only issue is the scope of the legislature’s authorization in Administrative Code § 18-118 and whether the use contemplated falls within that authorization — a question of statutory interpretation.
To resolve this issue, we rely first and foremost on the plain language of the statute and canons of statutory interpretation. In my view, the statute expressly authorizes the proposed development of Willets West. Because I conclude that the development is specifically authorized by Administrative Code § 18-118 and would promote the specific public purposes set forth in the statute, I dissent from the majority view that the proposed development of Willets West, initiated by the City of New York and promoted and supported by the City and New York State, violates the public trust doctrine. I would therefore remit the case to the Appellate Division to consider the three additional issues raised in this appeal, but not addressed by the Appellate Division, which concern the applicability of land use regulations and zoning resolutions, and whether formal City Council approval is required for the plan to proceed.
*442 L
In 1961, the state legislature enacted Administrative Code § 18-118, the law that led to the construction of Shea Stadium. This law also authorized the use of the adjacent parkland for a broad array of public purposes, including among others, to promote recreation, entertainment, amusement, and cultural betterment, and to improve trade and commerce. This legislation expressly authorized the entire alienated area, consisting of 77 acres, for non-park use.
Immediately to the east of the alienated parkland lies Wil-lets Point, a blighted and contaminated tract of land in Queens. This toxic wasteland of 61 acres is known as the “Iron Triangle” or, as F. Scott Fitzgerald described it 92 years ago in The Great Gatsby, the “Valley of Ashes.”[1] Willets Point is not parkland. Beginning in the 1960s, the decade when Administrative Code § 18-118 was enacted and Shea Stadium was built, City officials tried and failed to redevelop the area. Recent environmental studies show likely contamination in nearly every part of Willets Point and the groundwater beneath it. The risks to public health from this contamination are exacerbated by Wil-lets Point’s proximity to the Flushing River, in an area susceptible to constant flooding that lacks basic infrastructure, including sewers and storm drains.
In 2008, the City proposed a development plan that included remediation of the environmental waste in the land, new sewers and roads, and construction of a mixed-use community at Willets Point consisting of affordable housing, a school, a hotel, and several acres of public open space. The plan, however, was not economically feasible and was abandoned. In 2011, the plan was revised. This time the City partnered with the appellants, and included, in addition to the plan for Willets Point, a proposed entertainment and retail center at a neighboring site known as Willets West, where Shea Stadium once stood, and where asphalt parking lots for Citi Field are now located. The Willets West development would include, in addition to restaurants and shops, public programming spaces, meeting places, and a rooftop farm for educational purposes. According to the plan, the development of Willets West would facilitate the remediation and revitalization of Willets Point.
Petitioners commenced a hybrid CPLR article 78 proceeding and declaratory judgment action in Supreme Court, claiming *443 that the Willets West portion of the project violated the public trust doctrine because it was not authorized by state legislation, and that the Willets West component of the development plan requires further formal approval by the City Council.
Supreme Court denied the petition for declaratory and injunctive relief and dismissed the proceeding. The court reviewed the statutory language in Administrative Code § 18-118 and determined that rather than authorizing the use of the property for a stadium alone, the legislature considered "alternate uses of the property” that would “benefit the public.” The court held that the public trust doctrine was not violated because “use of the property for a shopping mall [would] serve the public purpose of improving trade or commerce” — one of the purposes specified in the statute — and that the intended use would likewise “serve the public purpose of ultimately altering the blighted Willets Point into a mixed use community.” Supreme Court further held that development of Wil-lets West is not subject to the City’s Uniform Land Use and Review Procedure, and that the City’s land use determinations were not arbitrary or capricious.
The Appellate Division unanimously reversed and granted the petition “to the extent of declaring that construction of Wil-lets West on City parkland without the authorization of the state legislature violates the public trust doctrine” (Matter of Avella v City of New York, 131 AD3d 77, 86-87 [1st Dept 2015]). The Appellate Division held “that the overriding context of Administrative Code § 18-118 concerns the stadium to be built” and “[t]here is simply no basis to interpret the statute as authorizing the construction of another structure that has no natural connection to a stadium” (id. at 84-85). The Court enjoined any further steps toward the construction of Willets West, and did not address the other land use issues.
II.
The majority states, “[t]here is no dispute that the Willets West development is proposed to be constructed entirely on city parkland” (majority op at 431). That is not the case. The proposed Willets West development would be constructed entirely on alienated parkland. When the state legislature codified Administrative Code § 18-118 in 1961, that 77 acre tract in Flushing Meadows Park was alienated and designated to further the non-park purposes specifically set forth in the statute.
“[T]he starting point in any case of interpretation must always be the language itself, giving effect to the plain mean *444 ing thereof” (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998]). A plain reading of Administrative Code § 18-118 shows that the legislature alienated the parkland at issue and authorized the City to enter into leases and other agreements with third parties for a variety of specific purposes, each of which it expressly declared to be a public purpose. Subdivision (a) of Administrative Code § 18-118 sets forth the City’s authority to enter into agreements for use of the alienated parkland and specifies that the alienated parkland includes not only the stadium but appurtenant grounds, parking areas and other facilities. Subdivision (b) lists the purposes for which that alienated property may be used. Nowhere does the statute limit authorized uses to those that “relate to the stadium itself and the naturally expected uses of a stadium,” as the Appellate Division held (131 AD3d at 86).
In Friends of Van Cortlandt Park, the legislature had not authorized non-park use for the disputed parcel, and the question was whether any legislative approval was required in the first place. In that case, we declared that parkland may be alienated for non-park purposes when there is “ ‘direct and specific approval of the State Legislature, plainly conferred’ ” (95 NY2d at 632 [citation omitted]).
Here, we have the legislature’s categorical approval. In subdivision (a) of the statute, the legislature directly authorized the area which includes Willets West to be used for non-park purposes; in subdivision (b), the legislature specifically listed those purposes. The plain language of these provisions makes clear that the development of Willets West, as summarized above, is well within this statutory authorization. The majority states, “[o]f course, the legislature remains free to alienate all or part of the parkland for whatever purposes it sees fit, but it must do so through direct and specific legislation that expressly confers the desired alienation” (majority op at 440). That is precisely what the legislature has done.
Administrative Code § 18-118 (a) begins by providing that the City may “from time to time” enter into agreements authorizing third parties “to use, occupy or carry on activities in, the whole or any part of a stadium, with appurtenant grounds, parking areas and other facilities, to be constructed by the city” (Administrative Code § 18-118 [a]). As of 1961, when Administrative Code § 18-118 was enacted, Black’s Law Dictionary defined “appurtenant” as “[b]elonging to; accessory *445 or incident to; adjunct, appended, or annexed to” (Black’s Law Dictionary 133 [4th ed 1951]). “Appurtenant grounds” in the statute was plainly a reference to the “adjunct” or additional acreage being alienated that would not be used for the stadium itself (see id. at 64 [defining “adjunct” as “(s)omething added to another”]).[2]
The second sentence of subdivision (a) specifies that “[p]rior to or after the expiration or termination” of the agreements referenced in the first sentence, the City may “enter into amended, new, additional or further” agreements or authorizations “for any purpose or purposes referred to in subdivision b” (Administrative Code § 18-118 [a] [emphasis added]). The majority would limit the second sentence of section 18-118 (a) to agreements that relate solely to the stadium. That, however, is not what it says. Moreover, if the second sentence of subdivision (a) merely allowed the City to enter into agreements that relate solely to a stadium, then this second sentence is superfluous since the first sentence of subdivision (a) already permits the City to enter into such agreements “from time to time.”
The legislature concludes subdivision (a) by specifically limiting the purposes for which the City may lease the stadium, grounds, parking areas and facilities, to “any purpose or purposes referred to in subdivision b.” Subdivision (b) (1), in turn, states that the City may enter into any agreements, leases, permits, contracts, or other authorizations “for any purpose or purposes which is of such a nature as to . . . provide for the benefit of, the people of the city, recreation, entertainment, amusement, education, enlightenment, cultural development or betterment, and improvement of trade and commerce” (id. § 18-118 [b]).
The Willets West center would include retail shops, a movie theater, restaurants, a food court, public programming spaces, and a rooftop farm. These uses fit squarely within the specific purposes set out in subdivision (b) (1). Movie theaters and *446 restaurants provide amusement and gathering places for patrons. Like spectator sports, films engage, inspire, and entertain viewers, and have the added potential to expose audiences to other cultures and viewpoints, promoting cultural development and betterment. Public programming spaces are available for art exhibitions and performances and meeting places provide areas for education and community development. Likewise, the rooftop farm would be available to schools and other organizations so they may learn about urban farming and the environment.
Subdivision (b) (1) also sets out, as another authorized purpose, “[the] improvement of trade and commerce”— something that a shopping center in this blighted area would promote. Indeed, although the legislature could have omitted the purpose of “improvement of trade and commerce” from the list of specifically authorized purposes in favor of loftier intellectual or cultural purposes, it did not. The notion that the specific reference to “improvement of trade and commerce” nonetheless excludes a shopping center is as unsupportable as the notion that “entertainment” excludes a movie theater or that “cultural development” excludes exhibition or meeting spaces. Indeed, the development plan at issue would promote all of these specific statutorily authorized purposes.[3]
Subdivision (b) (2) provides independent authority for another purpose, separate from those in subdivision (b) (1): to permit the land to be used “for any business or commercial purpose which aids in the financing of the construction and operation of [the] stadium, grounds, parking areas and facilities” {id. § 18-118 [b] [2]).
The legislature’s inclusion of subdivision (b) (2) likewise supports reversal of the Appellate Division order for two independent reasons. First, if the legislature intended to authorize uses only “relate [d] to the stadium itself and the naturally *447 expected uses of a stadium” (Avella, 131 AD3d at 86), the expansive public purposes specified in subdivision (b) (1) would be wholly unnecessary. In the same vein, if the broad purposes named in subdivision (b) (1) intended to substantially limit the City’s authority to stadium-related uses, then subdivision (b) (2) would be superfluous because anything that aids in the financing of the construction and operation of the stadium necessarily relates to the stadium. Therefore, subdivision (b) (1) must permit uses of the alienated parkland that involve something other than a stadium.
Second, subdivision (b) (2) distinguishes between the “improvement of trade and commerce,” as stated in subdivision (b) (1), and “any business or commercial purpose which aids in the financing of the construction and operation of [the] stadium, grounds, parking areas and facilities.” Subdivision (b) (1) specifically authorizes uses that improve trade and commerce for the benefit of the people of the City. By contrast, minor commercial uses, such as individual food vendors and seasonal concession stands in the stadium, might not have an impact large enough to improve trade and commerce for the benefit of the people of the City. Nonetheless, if such concessions support the financing and operation of the stadium, its grounds, parking areas and facilities, and any additions thereto, they would be authorized by subdivision (b) (2). The inclusion of subdivision (b) (2) in the legislation does not mean that the statute only allows a business or commercial purpose that benefits the stadium or its grounds; rather, it carves out an exception that permits commercial and business uses of the property that are smaller in scale (and thus might not be deemed to “improve” trade and commerce) but are nevertheless authorized uses of the alienated land. Subdivision (b) (2) does not alter or qualify the purpose in (b) (1) that permits uses of the alienated property that will improve trade and commerce.
The legislature ended subdivision (b) by explaining, in direct and specific language, that
“all of the purposes referred to in this subdivision are for the benefit of the people of the city and for the improvement of their health, welfare, recreation and prosperity, for the promotion of competitive sports for youth and the prevention of juvenile delinquency, and for the improvement of trade and commerce, and are hereby declared to be public purposes” (Administrative Code § 18-118 [b]).
*448 Although I have no doubt that the majority’s intention is to protect the public trust, the majority’s concern about undermining the public trust doctrine in this case is misplaced. Here, the legislature already decided to alienate the parkland at issue. The majority’s narrow reading of Administrative Code § 18-118 is principally derived from the statute’s title and immediate context — the construction of Shea Stadium — as opposed to the actual statutory language we are called upon to construe. The legislature sometimes speaks in broad terms and sometimes in targeted terms, but those distinctions have meaning, and it is this Court’s task to give effect to that meaning. Notwithstanding the broad, flexible, and expansive language embedded in this statute, the majority concludes that the authorization does not directly and specifically provide for the development of Willets West. Consequently, the majority’s implied holding is that the legislature must not only directly and specifically alienate parkland, but define the precise parameters of any development that may be built in the future. The necessary corollary of the majority’s decision is that the legislature may not alienate parkland for specific public purposes without the threat of the courts stepping in to further limit and circumscribe those purposes. This is a major departure from our precedent,[4] and will limit the legislature’s flexibility to craft statutes that allow for future development.[5] *449 Furthermore, it is entirely consistent with the statutory scheme to allow future development of the land at issue. As appellants pointed out during argument, and respondents did not (and cannot) refute, of the 77 acres alienated by statute, only about 16 acres were used to construct Shea Stadium {see Administrative Code § 18-118 [c]). There is nothing in the statute to suggest that it was the legislature’s intent to allow 61 acres of alienated parkland to sit idle in perpetuity or, as they are now, covered in asphalt.
III.
While the text of a statute is always of prime importance, its legislative history may inform the analysis (see Nostrom v A.W. Chesterton Co., 15 NY3d 502, 507 [2010]). Here, the legislation’s bill jacket shows that the immediate context of the law concerned the construction and use of the stadium. Nonetheless, while the legislature’s primary objective in enacting the law was to authorize construction of Shea Stadium, the legislature chose to craft that authorization in broad terms: not only to allow use of the parkland for Shea Stadium, but to permit the City to enter into agreements and any other “authorizations” that would use the alienated parkland for several broad purposes. Thus, while the legislative history emphasizes the immediate objective of the statute, it is the plain meaning of the statutory language that should guide our interpretation today and it unequivocally permits further development to promote the listed purposes.
IV.
Finally, some historical context further supports reversal, as do the practical realities regarding stadiums. Although the Appellate Division concluded that “[t]here is simply no basis to interpret the statute as authorizing the construction of another structure that has no natural connection to a stadium” {Avella, 131 AD3d at 85), history suggests that shopping areas and public markets are frequently located alongside athletic *450 stadiums. The largest and earliest stadium in ancient Rome, the Circus Maximus, demonstrates this fact. As early as the sixth century B.C., shops existed adjacent to the Circus Maximus to serve the needs of the spectators; similarly, when the Romans conquered the Greeks, they renovated the stadium at Olympia and built inns and shops in the area.
The practical realities regarding modern stadiums further support reversal as stadiums are frequently accompanied by malls or retail centers, adjacent to or near the sporting venues, to provide avenues for commerce and recreation that complement stadium attractions. Camden Yards in Baltimore, Gillette Stadium in Foxboro, Massachusetts, and Busch Stadium in St. Louis are all examples of the modern trend of using stadiums as hubs for economic activity. In fact, the author of an April 2017 article that discussed the evolution of stadium design over the last 40 years commented that “[f]rom pedestrian plazas to full-blown entertainment districts, the stadium projects of today are about much more than the game.”[6] To be sure, Administrative Code § 18-118 envisioned that a stadium would be located on the parkland. But, as we have previously held, we should not assume that legislators intend “to confine the scope of their legislation to the present, and to exclude all consideration for the developments of the future” (Matter of Comptroller of City of N.Y. v Mayor of City of N.Y., 7 NY3d 256, 266 [2006], quoting Hudson Riv. Tel. Co. v Watervliet Turnpike & Ry. Co., 135 NY 393, 403-404 [1892]).[7] The Appellate Division’s outdated and restrictive understanding of what is “natural[ly] connected]” to a stadium does the opposite, and should be rejected.
V.
Our Court’s fervent commitment to the public trust doctrine and our appreciation of natural parkland in our State is not undermined by a reversal in this case. The legislature expressly alienated the property at issue for non-park uses. More precisely, the legislature directly allowed for future development and use of this alienated parkland “for any purpose or *451 purposes which is of such a nature as to furnish to, or foster or promote among, or provide for the benefit of, the people of the city, recreation, entertainment, amusement, education, enlightenment, cultural development or betterment, and improvement of trade and commerce” (Administrative Code § 18-118 [b] [1]). Permitting the Willets Point Plan to proceed certainly does not put parks elsewhere in our State at risk of being demolished and replaced with brick, mortar, and plastic. Instead, the proposed development has the potential to turn vacant lots into a vibrant community, transform parking lots into places of public use and enjoyment, and replace asphalt with hope and aspirations for the blighted community of Wil-lets Point.
In sum, the majority’s holding ignores the statute’s plain text. The majority’s narrow view that the statute authorizes only the construction of a stadium, or facilities directly related to a stadium, disregards the prescient and forward-looking nature of the statutory language. Willets West is designed to achieve the legislative objectives laid out expressly in the statute — improvement of trade and commerce and the promotion of recreation, entertainment, amusement, and cultural betterment. If permitted, the development will be enjoyed by those going to Citi Field, as well as others seeking recreation, food, shops, and entertainment. An afternoon at the ball game could become a day-long event, where families can shop, see a movie, and share a meal together. The New York State Legislature specifically allowed for this eventuality when it enacted the statute, and we should therefore find that the contemplated development of Willets West is an authorized use of this alienated parkland.
Accordingly, I dissent.
Judges Rivera, Stein, Fahey and Garcia concur; Chief Judge DiFiore dissents in an opinion.
Order affirmed, with costs.

. See F. Scott Fitzgerald, The Great Gatsby 16 (1925).

. Indeed, in the first paragraph of section 18-118 (b), the use of “appurtenant” to describe the grounds is abandoned, and the City is authorized to grant any person or persons contracting with the City “the right to use, occupy or carry on activities in, the whole or any part of such stadium, grounds, parking areas and other facilities” (Administrative Code § 18-118 [b] [emphasis added]). Notably, the City may authorize third parties not only to “use” the grounds or parking areas, but to “occupy” these areas for any purpose specified in subdivision (b).

. Following subdivision (b) (1)⅛ list of authorized purposes, the statute contains some examples of possible uses that would promote those purposes, such as theatrical presentations, trade conventions and exhibitions. Where, as here, a statute specifies that a list of general purposes “includes” certain specific items, those items are no more than a nonexhaustive list of examples (see e.g. Matter of Walker, 64 NY2d 354, 358 [1985] [“(W)ords of a general bequest followed by enumerated articles are not limited to things similar to the specific items listed”]; Matter of Cahill v Rosa, 89 NY2d 14, 21 [1996]). Here, the legislature chose to use the word “including” before the list of examples and omit any limiting language, thereby not restricting the statute’s application to the examples listed.

. See e.g. Union Sq. Park, 22 NY3d at 654 (“Under the public trust doctrine, dedicated parkland cannot be converted to a nonpark purpose for an extended period of time absent the approval of the State Legislature”); Friends of Van Cortlandt Park, 95 NY2d at 632 (alienating parkland “requires the direct and specific approval of the State Legislature, plainly conferred” [internal quotation marks and citation omitted]); Brooklyn Park Commrs. v Armstrong, 45 NY 234, 243 (1871) (“Receiving the title in trust for an especial public use, [the city] could not convey without the sanction of the legislature; and the act of 1870 expresses the legislative sanction. ... It was within the power of the legislature to relieve the city from the trust to hold [the land] for a use only, and to authorize it to sell and convey”).

. The majority cites Potter v Collis (156 NY 16 [1898]) as part of our Court’s public trust jurisprudence. However, in that case we held that the Common Council of New York City could not “invest private parties with an exclusive interest in [the public] streets” because the Railroad Act in question did not grant any contracting authority to the City; that authority remained “vested solely in the legislature” (156-NY at 30-31). Here, the legislature expressly alienated the property at issue and granted the City specific contracting authority to promote the purposes set out in the statute. Although the majority cites Matter of City of New York (228 NY 140 [1920]) for the proposition that “ ‘[w]hen there is a fair, reasonable and substantial doubt concerning the existence of an alleged power in a municipality, the *449 power should be denied’ ” (majority op at 432, quoting Matter of City of New York, 228 NY at 152), in that case we explicitly held that the statute at issue demonstrated that the legislature intended “to prohibit the alienation of all water front property owned by the city” (id. at 151 [emphasis added]). Clearly, that case should not guide our interpretation of a statute that expressly alienates public land. The majority’s citation to Matter of Lake George Steamboat Co. v Blais (30 NY2d 48 [1972]) is equally inapposite, since that case does not involve any legislative enactment that expressly alienates parkland.

. Paul Steinbach, Stadium Design Evolution from 1977 to 2017, Athletic Business, Apr. 2017, http://www.athleticbusiness.com/stadium-arena/ stadium-design-evolution-from-1977-to-2017.html (accessed May 30, 2017).

. That is particularly so where, as here, the statute specifically contemplates and permits new contracts, leases, agreements, and authorizations after the initial ones have expired.