This opinion is uncorrected and subject to revision before
publication in the New York Reports.
--------------------------------------------------------------------

No. 54
In the Matter of Senator Tony
Avella, et al.,
            Respondents,
        v.
City of New York, et al.,
            Respondents,
Queens Development Group, LLC,
et al.,
            Appellants.




            Caitlin J. Halligan, for appellants.
            Richard P. Dearing, for City respondents.
            John R. Low-Beer, for respondents Avella et al.
            Anisha Dasgupta, for amicus curiae Attorney General of
the State of New York.
            Natural Resources Defense Council et al., amici curiae.




WILSON, J.:

        Plaintiffs -- a State Senator, not-for-profit

organizations, businesses, taxpayers, and users of Flushing

Meadows Park, brought this hybrid CPLR article 78 proceeding and

declaratory judgment action in Supreme Court seeking to enjoin

- 1 -

the proposed development of parkland in Queens.  The proposed development, "Willets West," involves the construction of a shopping mall and movie theater on Citi Field's parking lot, where Shea Stadium once stood.

Following New York's loss of both the Dodgers and Giants, Mayor Wagner, determined that New York City should have a National League Team, formed a Baseball Committee, led by William Shea, to work with Major League Baseball and others to obtain an expansion franchise for New York City.  Major League Baseball approved the issuance of a franchise to the New York Metropolitan Baseball Club, conditioned upon the club's ability to secure the rights to use of a stadium that met League specifications (see Off of Mayor Supp Mem in Support, Bill Jacket, L 1961, ch 729 at 41).  In 1961, the state legislature enacted a law providing for the financing and use of a municipal baseball stadium within Flushing Meadows Park, later named Shea Stadium.  As the State Department of Commerce noted in a memorandum supporting the bill, "[t]h[e] legislation [wa]s needed in order to get a second major league baseball team in New York City" (Bill Jacket, L 1961, ch 729 at 15).  Shea Stadium was home to the New York Mets for nearly 50 years, before it was demolished in 2008 and replaced with a new stadium, Citi Field.

To the east of the parkland is an area known as Willets Point.  As the Appellate Division noted, and as the parties agree, "Willets Point is a 61-acre area that has long been

considered to be blighted.  Indeed, Willets Point has no sewers, sidewalks or streetlights, is replete with potholed and rutted streets, and is prone to flooding" (131 AD3d 77, 78 [1st Dept 2015]).  Prior proposals to remediate and develop Willets Point have foundered.

In response to the City's request for proposals, in 2011, defendant Queens Development Group, LLC (QDG),[1] proposed a two-phase project for developing Willets Point.  The current Willets Point Plan calls for construction, in several staged phases, of retail space, a hotel, an outdoor space, a public school, and affordable housing in the Willets Point neighborhood, and the construction of a large-scale retail complex on the parkland of Willets West.  QDG included Willets West in the development proposal under the theory that "the creation of a retail and entertainment center at Willets West w[ould] spur a critical perception change of Willets Point, establishing a sense of place and making it a destination where people want to live, work, and visit."

The phases of the planned development project are as follows: Phase 1A, which was set to begin in 2015, included the construction of Willets West.  That phase calls for a retail mall to be built on parkland -- which is currently Citi Field's parking lot -- and would include over 200 retail stores and

---

[1] QDG is a joint venture formed by entities controlled by the Sterling Equities Associates, owner of the Mets, and The Related Companies, a real estate development firm.

restaurants, as well as a movie theater.  Phase 1A would also
include the installation of sewage systems, roads and ramps, and
a hotel in Willets Point.  Phase 1B, expected to begin in 2026,
would include construction of 2,490 housing units (35 percent of
which would be affordable), a public school, and open outdoor
space.  Under the agreement between QDG and the New York City
Economic Development Corporation, QDG could avoid phase 1B by
paying $35 million. The City approved QDG's proposal in May of
2012.

Thereafter, plaintiffs commenced the instant action
against defendants including, among others, the City, various
municipal officers and entities, and QDG, alleging that because
the Willets West development was located within parkland, the
public trust doctrine required legislative authorization, which
had not been granted.  Supreme Court denied the petition for
declaratory and injunctive relief and dismissed the proceeding.
The Appellate Division unanimously reversed and granted the
petition "to the extent of declaring that construction of Willets
West on City parkland without the authorization of the state
legislature violates the public trust doctrine, and enjoining any
further steps toward its construction" (131 AD3d at 87).  We
granted defendant QDG and related entities leave to appeal (26
NY3d 912 [2015]).[2]  We now affirm.

_____

[2] The City did not seek leave to appeal in this case, but
filed a brief in support of reversal.

I.

There is no dispute that the Willets West development is proposed to be constructed entirely on city parkland. The public trust doctrine is ancient and firmly established in our precedent. In Brooklyn Park Commrs. v Armstrong we held that, when a municipality takes land "for the public use as a park[,] . . . [it holds] it in trust for that purpose . . . Receiving the title in trust for an especial public use, [the municipality] could not convey [the land] without the sanction of the legislature" (45 NY 234, 243 [1871]). Likewise, in Matter of Petition of Boston & Albany R.R. Co., we held that parklands held by a village were held "upon a special trust and for public use. The village could not dispose of them or divert them from the purpose to which they were dedicated" (53 NY 574, 576 [1873]). Summarizing the longstanding history of the public trust doctrine in Friends of Van Cortlandt Park v City of New York, we explained that "our courts have time and again reaffirmed the principle that parkland is impressed with a public trust, requiring legislative approval before it can be alienated or used for an extended period for non-park purposes" (95 NY2d 623, 630 [2001]).

Only the state legislature has the power to alienate parkland (or other lands held in the public trust) for purposes other than those for which they have been designated. The parties here agree with that proposition. Even though a municipality may own the land dedicated to public use, "the title

of the municipal corporation to the public streets [is] held in trust for the public, and the power to regulate those uses [is] vested solely in the legislature" (Potter v Collis, 156 NY 16, 30 [1898]).

The approval of the legislature in alienating parkland must be "plainly conferred" through the "direct and specific approval of the state legislature" (Friends of Van Cortlandt Park, 95 NY2d at 632 [internal quotation marks and citation omitted]; see Capruso v Village of Kings Point, 23 NY3d 631, 639 [2014]; Williams v Gallatin, 229 NY 248, 253 [1920]). Although we have often articulated that principle in the context of an initial alienation of lands held in the public trust (see e.g. Friends of Van Cortlandt Park, 95 NY2d at 631), the principle also requires that a proposed use of parkland falls within the scope of legislative authorization once granted. For example, in Potter v Collis, we held that, although the legislature's General Railroad Act of 1850 authorized municipalities to assent to the construction of railroads, that legislative authorization was not "sufficient to authorize a city street railroad," and the City's resolution granting a third party authorization to construct a railroad on public streets was therefore invalid under the public trust doctrine (156 NY at 30). As we held in Matter of City of New York [Piers Old Nos. 8-11], which involved New York City's right to alienate piers and wharves held in the public trust, "[w]hen there is a fair, reasonable and substantial doubt

concerning the existence of an alleged power in a municipality, the power should be denied" (228 NY 140, 152, [1920]). We reiterated that rule in Lake George Steam Boat Co. v Blais, in which we said, "legislative sanction must be clear and certain to permit a municipality to lease public property for private purposes" (30 NY2d 48, 52 [1972]).

Keeping in mind that the current proposed alienation must plainly fall within the scope of the legislative direction authorizing alienation of the parklands at issue, we now turn to an examination of the statute relied on by defendants for the legislative authorization of Willets West.

## II.

Defendants contend that the 1961 legislation concerning Shea Stadium, which the City constructed on parkland, constitutes legislative authorization for the Willets West development. That legislation, codified in section 18-118 of the Administrative Code of the City of New York, is titled: "Renting of stadium in Flushing Meadow park; exemption from down payment requirements." Section 18-118 (a) provides, as relevant here:

> "a. Notwithstanding any other provision of law, general, special or local, the city, . . . is hereby authorized and empowered from time to time to enter into contracts, leases or rental agreements with, or grant licenses, permits, concessions or other authorizations to, any person or persons, upon such terms and conditions, for such consideration, and for such term of duration as may be agreed upon by the city and such person or persons, whereby such person or persons are granted the right, for any purpose or purposes referred to in subdivision b of this section, to use, occupy or carry on activities in, the whole or

any part of a stadium, with appurtenant grounds, parking areas and other facilities, to be constructed by the city on certain tracts of land described in subdivision c of this section, being a part of Flushing Meadow park . . . Prior to or after the expiration or termination of the terms of duration of any contracts, leases, rental agreements, licenses, permits, concessions or other authorizations entered into or granted pursuant to the provisions of this subdivision and subdivision b of this section, the city, in accordance with the requirements and conditions of this subdivision and subdivision b of this section, may from time to time enter into amended, new, additional or further contracts, leases or rental agreements with, and grant new, additional or further licenses, permits, concessions or other authorizations to, the same or any other person or persons for any purpose or purposes referred to in subdivision b of this section."

Section 18-118 (b), in turn, provides:

"b. Any contract, lease, rental agreement, license, permit, concession or other authorization referred to in subdivision a of this section may grant to the person or persons contracting with the city thereunder, the right to use, occupy or carry on activities in, the whole or any part of such stadium, grounds, parking areas and other facilities, (1) for any purpose or purposes which is of such a nature as to furnish to, or foster or promote among, or provide for the benefit of, the people of the city, recreation, entertainment, amusement, education, enlightenment, cultural development or betterment, and improvement of trade and commerce, including professional, amateur and scholastic sports and athletic events, theatrical, musical or other entertainment presentations, and meetings, assemblages, conventions and exhibitions for any purpose, including meetings, assemblages, conventions and exhibitions held for business or trade purposes, and other events of civic, community and general public interest, and/or (2) for any business or commercial purpose which aids in the financing of the construction and operation of such stadium, grounds, parking areas and facilities, and any additions, alterations or improvements thereto, or to the equipment thereof, and which does not interfere with the accomplishment of the purposes referred to in paragraph one of this subdivision. It is hereby declared that all of the purposes referred to in this subdivision are for the benefit of the people

of the city and for the improvement of their health, welfare, recreation and prosperity, for the promotion of competitive sports for youth and the prevention of juvenile delinquency, and for the improvement of trade and commerce, and are hereby declared to be public purposes."

When interpreting a statute, "our primary consideration is to discern and give effect to the Legislature's intention" (Matter of Albany Law School v New York State Off. of Mental Retardation & Dev. Disabilities, 19 NY3d 106, 120 [2012]). The text of a statute is the "clearest indicator" of such legislative intent and "courts should construe unambiguous language to give effect to its plain meaning" (DaimlerChrysler Corp. v Spitzer, 7 NY3d 653, 660 [2006]). We have also previously instructed that "[i]t is an accepted rule that all parts of a statute are intended to be given effect and that a statutory construction which renders one part meaningless should be avoided" (Rocovich v Consolidated Edison Co., 78 NY2d 509, 515 [1991]). Furthermore, "a statute . . . must be construed as a whole and . . . its various sections must be considered together and with reference to each other" (Matter of New York County Lawyers' Assn. v Bloomberg, 19 NY3d 712, 721 [2012]). Defendants' argument disregards these fundamental rules of statutory interpretation.

Beginning with the plain language, subdivision (a) of section 18-118 grants the City the right to "enter into contracts, leases or rental agreements," etc., for persons wishing "to use, occupy or carry on activities in, the whole or any part of a stadium, with appurtenant grounds, parking areas

and other facilities."  Nothing in that language authorizes the
construction of a shopping mall or movie theater; rather, it
authorizes the City to enter into agreements permitting others to
use the stadium and its appurtenant facilities.[3]  The term
"appurtenant" means "[a]nnexed to a more important thing,"
(Black's Law Dictionary [10th ed. 2014]); or "constituting a
legal accompaniment" or "auxiliary, accessory" to something else
(Merriam-Webster, https://www.merriam-
webster.com/dictionary/appurtenant [accessed May 17, 2017]).
Accordingly, the clear implication of the reference to
"appurtenant . . . facilities" is that any such facilities must
be related to, part of, belonging to, or serving some purpose
for, the stadium itself.

Defendants point to the last sentence of subdivision
(a), authorizing "the city, in accordance with the requirements
and conditions of this subdivision and subdivision b of this
section, [to] . . . enter into amended, new, additional or

---

[3] Supreme Court relied on Murphy v Erie County (28 NY2d 80
[1971]) for the proposition that a "municipality may lease
improvements to property to a private operator, on the condition
that it serves a public purpose, and that ownership of the
improvement is retained by the municipality."  In Murphy, the
authorizing legislation, much like the statute here, allowed the
county to "enter into contracts, leases, or rental agreements
with, or grant licenses, permits, concessions, or other
authorizations, to any person or persons."  We held: "Quite
obviously, it was designed to give the county the broadest
latitude possible in the operation of the stadium" (id. at 87).
Nothing in Murphy suggests that a grant of legislative authority
to lease a stadium located in parkland to a private business
constitutes a legislative grant to allow private businesses to
build unrelated commercial enterprises on the parkland.

further contracts, leases or rental agreements . . . for any
purpose or purposes referred to in subdivision b of this
section," arguing that subsection (b) specifically authorizes
this type of development on the parkland because one of the
enumerated uses allowed is the "improvement of trade and
commerce" (Administrative Code of the City of New York § 18-118
[b] [1]).  That argument is also unpersuasive.[4]  The purposes
enumerated in the legislation are consistent with typical uses of
a park and/or stadium, including "scholastic sports and athletic
events," "theatrical, musical or other entertainment
presentations," and "meetings, assemblages, conventions and
exhibitions."

Subdivision (b), like subdivision (a), is limited to
agreements the City might enter into for "the right to use,
occupy or carry on activities in, the whole or any part of such
stadium, grounds, parking areas and other facilities."  Here,

---

[4] On its face, the statute permits use of the stadium and
facilities for, among other things, the improvement of trade and
commerce.  It does not permit, however, the construction of other
facilities for the purpose of improving trade and commerce.  Even
if the statutory language were ambiguous, "Guided by the familiar
canon of construction of noscitur a sociis, we ordinarily
interpret the meaning of an ambiguous word in relation to the
meanings of adjacent words" (Matter of Kese Indus. v Roslyn Torah
Found., 15 NY3d 485, 491 [2010]; see State of New York v Mobil
Oil Corp., 38 NY2d 460, 464 [1976]) and, following that canon,
the phrase "improvement of trade or commerce" (Administrative
Code of the City of New York § 18-118 [b] [1]) -- in light of the
examples given and the other purposes listed in the statute --
cannot reasonably be interpreted to encompass a private for-
profit enterprise constructing an entirely new development on the
parkland.

"other facilities" in section (b) cannot be divorced from its statutory context: "appurtenant grounds, parking areas and other facilities to be constructed by the city," to be read as a legislative grant to authorize the private construction of anything deemed by the City to improve trade and commerce.  Just as a general statute authorizing municipalities to construct railroads on lands held in the public trust did not authorize New York City to construct a street railroad, the 1961 legislation does not authorize the construction of a retail complex and movie theater.

Reading "improvement of trade or commerce" as the City suggests -- namely, as authorization for the construction of anything that might improve trade or commerce -- would lead to an absurd result.  The purposes enumerated in (b)(1) could not be read to exclude any use of the parkland, if understood to mean that the land can be used for any purpose at all related to the "improvement of trade and commerce" or "education," "amusement," "cultural development" or "enlightenment" (Administrative Code of the City of New York § 18-118 [b] [1]).  For example, defendants' interpretation of the statute would permit the conversion of the parkland into a second Times Square or Wall Street, which is decidedly not evidenced in the statutory language.  Moreover, had the legislature truly intended to authorize any use of the parkland, including private for-profit business enterprises, those portions of the statute describing the authorized uses

would be rendered superfluous.[5]

Defendants point to the differences between the 1961 legislation and the 2005 legislation authorizing the development of the new Yankee Stadium, arguing that when the legislature wanted to restrict its authorization to "development of a baseball stadium," it knew how to do so.  That argument misses the mark for several reasons.

First, that the legislature used different words in 2005 does not shed any real light on what the 1961 legislature meant.  Second, the language cited by defendants from the 2005 Yankee Stadium legislation, restricting the legislative grant to "contracts, leases or rental agreements for a term not to exceed ninety-nine years, *with the New York Yankees Limited Partnership*, its affiliate and/or another entity or entities *for the purpose of developing, maintaining and operating thereon a professional baseball stadium* and related facilities" would have been

_____

[5] The incompatibility between defendants' proposed use and the authorization provided by the statute is also illustrated by reference to subdivision (b) (2) of section 18-118.  That subdivision authorizes leases for "any business or commercial purpose which aids in the financing of the construction and operation of the stadium, grounds, parking areas and facilities." This plainly refers to private profit enterprises, but applies only where the purposes aid in the financing of the stadium, which compels the conclusion that "business and commercial purposes" are not authorized where the businesses or commercial use does not aid in the financing of the stadium (Administrative Code of the City of New York § 18-118 [b] [2]; see generally Two Guys from Harrison-N.Y. v S.F.R. Realty Assoc., 63 NY2d 396, 404 [1984] ["specification of certain permitted activities . . . should be read as implicitly prohibiting other(s)" under doctrine of "inclusio unius est exclusio alterius"]).

inapposite as to Shea Stadium, which was conceived as a

multipurpose stadium that the City was free to lease to others

(and which in fact housed the New York Jets football team from

1964-1983) (2005 NY Laws 2923 [ch 238 § 2 (a)-(b) [McKinney 2005]

[emphasis in defendants' brief]).

Defendants also contend that, whereas the 2005 Yankee

Stadium legislation limits the City's authority to "stadium

related facilities," the 1961 legislation does not.  However, the

1961 legislation limits the City's legislation to "appurtenant

grounds, parking areas and other facilities," and we perceive no

difference between "appurtenant" and "stadium related" in the

context of these statutes.

III.

The plain language of the statute does not authorize

the proposed construction, and we therefore need not consider the

legislative history.  However, that history also unambiguously

demonstrates that the legislature did not authorize the City to

do more than enter into agreements for use of the stadium for

public -- not commercial -- purposes and avoid certain

restrictions to ease the financial burden on the City of

constructing the stadium.

As a starting point, the title of the statute, "Renting

of a stadium in Flushing Meadow park; exemption from down payment

requirements," suggests nothing at all about legislative

authorization for anything other than a stadium and, indeed,

pertains only to the renting of the stadium and exemption from statutory requirements that would have required a down payment. Although the title of the legislation may not "trump the clear language of the statute," it "may help in ascertaining the [legislative] intent" (<u>Suffolk Regional Off-Track Betting Corp. v New York State Racing and Wagering Bd.</u>, 11 NY3d 559, 571 [2008]; <u>see</u> Statutes Law § 123 [McKinney])

Consistent with the bill's title, the legislative history demonstrates that the statute was intended to authorize the lease, rental or licensing of the stadium, not the construction of unrelated facilities.  A Memorandum in Support of the bill from the Mayor's Office wrote that the bill "would authorize the City . . . to lease or rent, from time to time, for customary municipal stadium purposes, the 55,000-seat stadium with 5,500 parking spaces . . . proposed to be constructed by the City in Flushing Meadow Park, Borough of Queens, upon such terms and conditions . . . as may be agreed upon by the City and the persons leasing or renting the stadium" (Bill Jacket, L 1961, ch 729 at 32).

The City did not explain the need for the legislation in terms of authorization for the construction of anything at all -- even a stadium; instead, the memorandum explained: "since the stadium is to be located on park lands, and since such lands are inalienable under the provisions of § 383 of the city Charter, the City will be unable to <u>lease</u> or <u>rent</u> the stadium for

customary stadium purposes . . . without authorization by the
Legislature.  Moreover, without such authorization, the City will
be unable to operate the stadium suitably as a revenue-producing
project" (id. at 33 [emphasis added]).  Thus, the City requested
the legislation to grant it the right to rent the stadium to
private entities, not to construct new and unrelated facilities
for private business purposes.

In Williams v Gallatin, we noted that "park purposes"
may include "playing grounds," which "contribute to the use and
enjoyment of the park" (229 NY 248, 253-254 [1920]).  A
municipality may, without legislative authorization, make
improvements to a park that are consistent with its status as "a
pleasure ground set apart for recreation of the public, to
promote its health and enjoyment.  It need not and should not be
a mere field or open space" (id.).  Our observation that
municipalities may improve parks without legislative
authorization by, among other things, the construction of playing
fields, is consistent with the statutory language and legislative
history of the 1961 legislation at issue here.  The City
explained:

> "This bill would confer upon the City the leasing and
> renting powers necessary to make the stadium available
> for professional, amateur and scholastic sports and
> athletic events and entertainment presentations, and
> the holding of meetings, conventions, exhibitions and
> events of civic, cultural and community interest.  Such
> powers are essential to enable the City to cooperate in
> the establishment of a new National League baseball
> team in the City, and to operate the stadium as a

revenue-producing project which, as is explained below,
will be substantially self-sustaining"

(Off of Mayor Supp Mem in Support, Bill Jacket, L 1961, ch 729 at

38).  Thus, the City sought legislative approval because rental

-- not construction -- of the stadium constituted an alienation.[6]

Legislative authorization to rent Shea Stadium and its grounds to

private parties cannot, under our longstanding construction of

the public trust doctrine, constitute legislative authorization

to build a shopping mall or movie theater.[7]

        The budget report on the bill stated that "the bill

grants statutory authority for the City to lease or rent the

stadium which could not otherwise be leased or rented because of

its location on inalienable park lands" (Bill Jacket, L 1961, ch

729 at 27).  A report on the bill from the Department of Audit

---

[6] Likewise, the bill jacket contains a telegram from William
Shea to Governor Nelson Rockefeller, sent in anticipation of the
legislation's passage, which said, "the approval by the state
legislature of the leasing of the stadium is our last step" (Bill
Jacket, L 1961, ch 729).  In a memorandum summarizing the bill,
the New York State Department of Commerce wrote that its purpose
was to amend the code "in relation to financing the construction
of a stadium to be erected by the City of New York . . . and
authorizing, in aid of such financing, the renting of such a
stadium and exemption from down payment requirements" (Bill
Jacket, L 1961, ch 729 at 15).

[7] The other legislative approval required by the City,
captured in subdivision (e), related to the City's need for an
exemption from the down-payment requirement of section 107.00 of
the Local Finance Law, "[b]ecause of the impracticability of
issuing 15-year bonds, and because of the indicated minor
deficits preventing operation of the stadium on a fully self-
sustaining basis initially" (Off of Mayor Supp Mem in Support,
Bill Jacket, L 1961, ch 729 at 40; see generally id. at 38-40).

and Control, addressed to the Governor, describes each subsection of the bill: paragraph a, it says, "authorizes the Commissioner of Parks, with the approval of the Board of Estimate, to enter into contracts, leases or rental agreements, or grant licenses, permits, concessions or other authorizations for the use of the whole or any part of the new stadium" (Bill Jacket, L 1961, ch 729 at 28).  The report then writes that "Paragraph b describes the purposes for which such use may be granted" (id.).

The statutory language and legislative history demonstrate that the legislation did not authorize further developments on the tract of parkland but, rather, ensured that the City was authorized to accommodate other public uses of the stadium and appurtenant facilities.

IV.

In sum, the text of the statute and its legislative history flatly refute the proposition that the legislature granted the City the authority to construct a development such as Willets West in Flushing Meadows Park.

We acknowledge that the remediation of Willets Point is a laudable goal.  Defendants and various amici dedicate substantial portions of their briefs to the propositions that the Willets West development would immensely benefit the people of New York City, by transforming the area into a new, vibrant community, and that the present plan might be the only means to accomplish that transformation.  Those contentions, however, have

no place in our consideration of whether the legislature granted authorization for the development of Willets West on land held in the public trust.  Of course, the legislature remains free to alienate all or part of the parkland for whatever purposes it sees fit, but it must do so through direct and specific legislation that expressly confers the desired alienation.

Plaintiffs' additional claims are rendered academic by our decision.  Accordingly, the order of the Appellate Division should be affirmed, with costs.

Matter of Avella v City of New York

No. 54

DiFIORE, Chief Judge (dissenting):

Under the public trust doctrine, parkland in our State is dedicated to public use, and can only be alienated for non-park purposes if expressly authorized by the State Legislature. Our Court's jurisprudence demonstrates unwavering support for the public trust doctrine. In such cases as Williams v Gallatin (229 NY 248 [1920]) and Friends of Van Cortlandt Park v City of New York (95 NY2d 623 [2001]), we held that the contemplated use of parkland for other than a "park use" violated the public trust doctrine. Notably, in those cases, the legislature had not expressly authorized non-park use, and it was up to us to uphold the public trust and determine "what is and is not a park purpose" (Union Sq. Park Community Coalition, Inc. v New York City Dept. of Parks and Recreation, 22 NY3d 648, 655 [2014]).

This case is different. Here, the legislature has spoken and directly and specifically authorized non-park uses of the property, as codified in Administrative Code of the City of New York § 18-118. Indeed, the specific parcel at issue, Willets West, presently covered in asphalt, is being used as a parking lot. Once the State Legislature alienates parkland for non-park purposes and expressly authorizes development on parkland, as it

- 1 -

has done here, our only role is to ensure that the proposed development comports with the authorization expressed in the statute.  We may not second-guess the legislature and such matters as the utility of the development, its aesthetics, or its benefit to the public are beyond our review.  Rather, the only issue is the scope of the legislature's authorization in Administrative Code § 18-118 and whether the use contemplated falls within that authorization -- a question of statutory interpretation.

To resolve this issue, we rely first and foremost on the plain language of the statute and canons of statutory interpretation.  In my view, the statute expressly authorizes the proposed development of Willets West.  Because I conclude that the development is specifically authorized by Administrative Code § 18-118 and would promote the specific public purposes set forth in the statute, I dissent from the majority view that the proposed development of Willets West, initiated by the City of New York and promoted and supported by the City and New York State, violates the public trust doctrine.  I would therefore remit the case to the Appellate Division to consider the three additional issues raised in this appeal, but not addressed by the Appellate Division, which concern the applicability of land use regulations and zoning resolutions, and whether formal City Council approval is required for the plan to proceed.

I.

In 1961, the State Legislature enacted Administrative Code § 18-118, the law that led to the construction of Shea Stadium. This law also authorized the use of the adjacent parkland for a broad array of public purposes, including among others, to promote recreation, entertainment, amusement, and cultural betterment, and to improve trade and commerce. This legislation expressly authorized the entire alienated area, consisting of seventy-seven acres, for non-park use.

Immediately to the east of the alienated parkland lies Willets Point, a blighted and contaminated tract of land in Queens. This toxic wasteland of sixty-one acres is known as the "Iron Triangle" or, as F. Scott Fitzgerald described it 92 years ago in The Great Gatsby, the "Valley of Ashes."[1] Willets Point is not parkland. Beginning in the 1960s, the decade when Administrative Code § 18-118 was enacted and Shea Stadium was built, City officials tried and failed to redevelop the area. Recent environmental studies show likely contamination in nearly every part of Willets Point and the groundwater beneath it. The risks to public health from this contamination are exacerbated by Willets Point's proximity to the Flushing River, in an area susceptible to constant flooding that lacks basic infrastructure, including sewers and storm drains.

In 2008, the City proposed a development plan that

---

[1] See F. Scott Fitzgerald, The Great Gatsby 16 (1925).

included remediation of the environmental waste in the land, new sewers and roads, and construction of a mixed-use community at Willets Point consisting of affordable housing, a school, a hotel, and several acres of public open space.  The plan, however, was not economically feasible and was abandoned.  In 2011, the plan was revised.  This time the City partnered with the appellants, and included, in addition to the plan for Willets Point, a proposed entertainment and retail center at a neighboring site known as Willets West, where Shea Stadium once stood, and where asphalt parking lots for Citi Field are now located.  The Willets West development would include, in addition to restaurants and shops, public performance spaces, meeting places, and a rooftop farm for educational purposes.  According to the plan, the development of Willets West would facilitate the remediation and revitalization of Willets Point.

Petitioners commenced a hybrid CPLR article 78 proceeding and declaratory judgment action in Supreme Court, claiming that the Willets West portion of the project violated the public trust doctrine because it was not authorized by State legislation, and that the Willets West component of the development plan requires further formal approval by the City Council.

Supreme Court denied the petition for declaratory and injunctive relief and dismissed the proceeding.  The court reviewed the statutory language in Administrative Code § 18-118

and determined that rather than authorizing the use of the property for a stadium alone, the legislature considered "alternate uses of the property" that would "benefit the public." The court held that the public trust doctrine was not violated because "use of the property for a shopping mall [would] serve the public purpose of improving trade or commerce" -- one of the purposes specified in the statute -- and that the intended use would likewise "serve the public purpose of ultimately altering the blighted Willets Point into a mixed-use community." Supreme Court further held that development of Willets West is not subject to the City's Uniform Land Use and Review Procedure (ULURP), and that the City's land use determinations were not arbitrary or capricious.

The Appellate Division unanimously reversed and granted the petition "to the extent of declaring that construction of Willets West on City parkland without the authorization of the state legislature violates the public trust doctrine" (Matter of Avella v City of New York, 131 AD3d 77, 86-87 [1st Dept 2015]). The Appellate Division held "that the overriding context of Administrative Code § 18-118 concerns the stadium to be built" and "[t]here is simply no basis to interpret the statute as authorizing the construction of another structure that has no natural connection to a stadium" (id. at 84-85). The Court enjoined any further steps toward the construction of Willets West, and did not address the other land use issues.

II.

The majority states, "[t]here is no dispute that the Willets West development is proposed to be constructed entirely on city parkland" (majority op at 5). That is not the case. The proposed Willets West development would be constructed entirely on *alienated* parkland. When the State Legislature codified Administrative Code § 18-118 in 1961, that seventy-seven acre tract in Flushing Meadows Park was alienated and designated to further the non-park purposes specifically set forth in the statute.

"[T]he starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof" (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998]). A plain reading of Administrative Code § 18-118 shows that the legislature alienated the parkland at issue and authorized the City to enter into leases and other agreements with third parties for a variety of specific purposes, each of which it expressly declared to be a public purpose. Subdivision (a) of Administrative Code § 18-118 sets forth the City's authority to enter into agreements for use of the alienated parkland and specifies that the alienated parkland includes not only the stadium but appurtenant grounds, parking areas and other facilities. Subdivision (b) lists the purposes for which that alienated property may be used. Nowhere does the statute limit authorized uses to those that "relate to the

stadium itself and the naturally expected uses of a stadium," as the Appellate Division held (131 AD3d at 86).

In Friends of Van Cortlandt Park, the legislature had not authorized non-park use for the disputed parcel, and the question was whether *any* legislative approval was required in the first place. In that case, we declared that parkland may be alienated for non-park purposes when there is "'direct and specific approval of the State Legislature, plainly conferred'" (95 NY2d at 632 [citation omitted]).

Here, we have the legislature's categorical approval. In subdivision (a) of the statute, the legislature directly authorized the area which includes Willets West to be used for non-park purposes; in subdivision (b), the legislature specifically listed those purposes. The plain language of these provisions makes clear that the development of Willets West, as summarized above, is well within this statutory authorization. The majority states, "[o]f course, the legislature remains free to alienate all or part of the parkland for whatever purposes it sees fit, but it must do so through direct and specific legislation that expressly confers the desired alienation" (majority op at 19). That is precisely what the legislature has done.

Administrative Code § 18-118 (a) begins by providing that the City may "from time to time" enter into agreements authorizing third parties "to use, occupy or carry on activities

in, the whole or any part of a stadium, with appurtenant grounds, parking areas and other facilities, to be constructed by the city" (Administrative Code § 18-118 [a]).  As of 1961, when Administrative Code § 18-118 was enacted, Black's Law Dictionary defined "appurtenant" as "[b]elonging to; accessory or incident to; adjunct, appended or annexed to" (Black's Law Dictionary 133 [4th ed 1951]).  "Appurtenant grounds" in the statute was plainly a reference to the "adjunct" or additional acreage being alienated that would not be used for the stadium itself (see id. at 64 [defining "adjunct" as "[s]omething added to another"]).[2]

The second sentence of subdivision (a) specifies that "[p]rior to or after the expiration or termination" of the agreements referenced in the first sentence, the City may "enter into amended, new, additional or further" agreements or authorizations "for any purpose or purposes referred to in subdivision (b)" (Administrative Code § 18-118 [a] [emphasis added]).  The majority would limit the second sentence of section 18-118 (a) to agreements that relate solely to the stadium. That, however, is not what it says.  Moreover, if the second sentence of subdivision (a) merely allowed the City to enter into

---

[2]  Indeed, in the first paragraph of section 18-118 (b), the use of "appurtenant" to describe the grounds is abandoned, and the City is authorized to grant any person or persons contracting with the City "the right to use, occupy or carry on activities in, the whole or any part of such stadium, grounds, parking areas and other facilities" (Administrative Code § 18-118 [b] [emphasis added]).  Notably, the City may authorize third parties not only to "use" the grounds or parking areas, but to "occupy" these areas for any purpose specified in subdivision (b).

agreements that relate solely to a stadium, then this second sentence is superfluous since the first sentence of subdivision (a) already permits the City to enter into such agreements "from time to time."

The legislature concludes subdivision (a) by specifically limiting the purposes for which the City may lease the stadium, grounds, parking areas and facilities, to "any purpose or purposes referred to in subdivision (b)."  Subdivision (b) (1), in turn, states that the City may enter into any agreements, leases, permits, contracts, or other authorizations "for any purpose or purposes which is of such a nature as to . . . provide for the benefit of, the people of the city, recreation, entertainment, amusement, education, enlightenment, cultural development or betterment, and improvement of trade and commerce" (id. § 18-118 [b]).

The Willets West center would include retail shops, a movie theater, restaurants, a food court, public programming spaces, and a rooftop farm.  These uses fit squarely within the specific purposes set out in subdivision (b) (1).  Movie theaters and restaurants provide amusement and gathering places for patrons.  Like spectator sports, films engage, inspire, and entertain viewers, and have the added potential to expose audiences to other cultures and viewpoints, promoting cultural development and betterment.  Public programming spaces are available for art exhibitions and performances and meeting places

provide areas for education and community development.  Likewise, the rooftop farm would be available to schools and other organizations so they may learn about urban farming and the environment.

Subdivision (b) (1) also sets out, as another authorized purpose, "the improvement of trade and commerce" -- something that a shopping center in this blighted area would promote.  Indeed, although the legislature could have omitted the purpose of "improvement of trade and commerce" from the list of specifically authorized purposes in favor of loftier intellectual or cultural purposes, it did not.  The notion that the specific reference to "improvement of trade and commerce" nonetheless excludes a shopping center is as unsupportable as the notion that "entertainment" excludes a movie theater or that "cultural development" excludes exhibition or meeting spaces.  Indeed, the development plan at issue would promote all of these specific statutorily authorized purposes.[3]

---

[3] Following subdivision (b) (1)'s list of authorized purposes, the statute contains some examples of possible uses that would promote those purposes, such as theatrical presentations, trade conventions and exhibitions.  Where, as here, a statute specifies that a list of general purposes "includes" certain specific items, those items are no more than a nonexhaustive list of examples (see e.g. Matter of Walker, 64 NY2d 354, 358 [1985] ["(W)ords of a general bequest followed by enumerated articles are not limited to things similar to the specific items listed"]; Matter of Cahill v Rosa, 89 NY2d 14, 21 [1996]).  Here, the legislature chose to use the word "including" before the list of examples and omit any limiting language, thereby not restricting the statute's application to the examples listed.

Subdivision (b) (2) provides independent authority for another purpose, separate from those in subdivision (b) (1): to permit the land to be used "for any business or commercial purpose which aids in the financing of the construction and operation of [the] stadium, grounds, parking areas and facilities" (id. § 18-118 [b] [2]).

The legislature's inclusion of subdivision (b) (2) likewise supports reversal of the Appellate Division order for two independent reasons. First, if the legislature intended to authorize uses only "relate[d] to the stadium itself and the naturally expected uses of a stadium" (Avella, 131 AD3d at 86), the expansive public purposes specified in subdivision (b) (1) would be wholly unnecessary. In the same vein, if the broad purposes named in subdivision (b) (1) intended to substantially limit the City's authority to stadium-related uses, then subdivision (b) (2) would be superfluous because anything that aids in the financing of the construction and operation of the stadium necessarily relates to the stadium. Therefore, subdivision (b) (1) must permit uses of the alienated parkland that involve something other than a stadium.

Second, subdivision (b) (2) distinguishes between the "improvement of trade and commerce," as stated in subdivision (b) (1), and "any business or commercial purpose which aids in the financing of the construction and operation of [the] stadium, grounds, parking areas and facilities." Subdivision (b) (1)

specifically authorizes uses that improve trade and commerce for the benefit of the people of the City.  By contrast, minor commercial uses, such as individual food vendors and seasonal concession stands in the stadium, might not have an impact large enough to improve trade and commerce for the benefit of the people of the City.  Nonetheless, if such concessions support the financing and operation of the stadium, its grounds, parking areas and facilities, and any additions thereto, they would be authorized by subdivision (b) (2).  The inclusion of subdivision (b) (2) in the legislation does not mean that the statute only allows a business or commercial purpose that benefits the stadium or its grounds; rather, it carves out an exception that permits commercial and business uses of the property that are smaller in scale (and thus might not be deemed to "improve" trade and commerce) but are nevertheless authorized uses of the alienated land.  Subdivision (b) (2) does not alter or qualify the purpose in (b) (1) that permits uses of the alienated property that will improve trade and commerce.

The legislature ended subdivision (b) by explaining, in direct and specific language, that

> "all of the purposes referred to in this subdivision are for the benefit of the people of the city and for the improvement of their health, welfare, recreation and prosperity, for the promotion of competitive sports for youth and the prevention of juvenile delinquency, and for the improvement of trade and commerce, and are hereby declared to be public purposes" (Administrative Code § 18-118 [b]).

Although I have no doubt that the majority's intention
is to protect the public trust, the majority's concern about
undermining the public trust doctrine in this case is misplaced.
Here, the legislature already decided to alienate the parkland at
issue.  The majority's narrow reading of Administrative Code §
18-118 is principally derived from the statute's title and
immediate context -- the construction of Shea Stadium -- as
opposed to the actual statutory language we are called upon to
construe.  The legislature sometimes speaks in broad terms and
sometimes in targeted terms, but those distinctions have meaning,
and it is this Court's task to give effect to that meaning.
Notwithstanding the broad, flexible, and expansive language
embedded in this statute, the majority concludes that the
authorization does not directly and specifically provide for the
development of Willets West.  Consequently, the majority's
implied holding is that the legislature must not only directly
and specifically alienate parkland, but define the precise
parameters of any development that may be built in the future.
The necessary corollary of the majority's decision is that the
legislature may not alienate parkland for specific public
purposes without the threat of the courts stepping in to further
limit and circumscribe those purposes.  This is a major departure
from our precedent,[4] and will limit the legislature's flexibility

--------

[4] See e.g. Union Sq. Park, 22 NY3d at 654 ("Under the public
trust doctrine, dedicated parkland cannot be converted to a
nonpark purpose for an extended period of time absent the
approval of the State Legislature"); Friends of Van Cortlandt

to craft statutes that allow for future development.[5]
Furthermore, it is entirely consistent with the statutory scheme
to allow future development of the land at issue.  As appellants
pointed out during argument, and respondents did not (and cannot)
refute, of the seventy-seven acres alienated by statute, only
about sixteen acres were used to construct Shea Stadium (see

---

Park, 95 NY2d at 632 (alienating parkland "requires the direct
and specific approval of the State Legislature, plainly
conferred" [quotation marks and citation omitted]); Brooklyn Park
Commrs. v Armstrong, 45 NY 234, 243 [1871] ("Receiving the title
in trust for an especial public use, [the city] could not convey
without the sanction of the legislature; and the act of 1870
expresses the legislative sanction. . . . It was within the power
of the legislature to relieve the city from the trust to hold
[the land] for a use only, and to authorize it to sell and
convey").
    [5] The majority cites Potter v Collis (156 NY 16 [1898]) as
part of our Court's public trust jurisprudence.  However, in that
case we held that the Common Council of New York City could not
"invest private parties with an exclusive interest in [the
public] streets" because the Railroad Act in question did not
grant any contracting authority to the City; that authority
remained "vested solely in the legislature" (156 NY at 30-31).
Here, the legislature expressly alienated the property at issue
and granted the City specific contracting authority to promote
the purposes set out in the statute.  Although the majority cites
Matter of City of New York (228 NY 140 [1920]) for the
proposition that "'[w]hen there is a fair, reasonable and
substantial doubt concerning the existence of an alleged power in
a municipality, the power should be denied'" (majority op at 6-7,
quoting Matter of City of New York, 228 NY at 152), in that case
we explicitly held that the statute at issue demonstrated that
the legislature intended "to prohibit the alienation of all water
front property owned by the city" (id. at 151 [emphasis added]).
Clearly, that case should not guide our interpretation of a
statute that expressly alienates public land.  The majority's
citation to Matter of Lake George Steam Boat Co. v Blais (30 NY2d
48 [1972]) is equally inapposite, since that case does not
involve any legislative enactment that expressly alienates
parkland.

Administrative Code § 18-118 [c]).  There is nothing in the
statute to suggest that it was the legislature's intent to allow
sixty-one acres of alienated parkland to sit idle in perpetuity
or, as they are now, covered in asphalt.

                              III.

        While the text of a statute is always of prime
importance, its legislative history may inform the analysis (see
Nostrom v A.W. Chesterton Co., 15 NY3d 502, 507 [2010]).  Here,
the legislation's bill jacket shows that the immediate context of
the law concerned the construction and use of the stadium.
Nonetheless, while the legislature's primary objective in
enacting the law was to authorize construction of Shea Stadium,
the legislature chose to craft that authorization in broad terms:
not only to allow use of the parkland for Shea Stadium, but to
permit the City to enter into agreements and any other
"authorizations" that would use the alienated parkland for
several broad purposes.  Thus, while the legislative history
emphasizes the immediate objective of the statute, it is the
plain meaning of the statutory language that should guide our
interpretation today and it unequivocally permits further
development to promote the listed purposes.

                              IV.

        Finally, some historical context further supports
reversal, as do the practical realities regarding stadiums.
Although the Appellate Division concluded that "[t]here is simply

no basis to interpret the statute as authorizing the construction of another structure that has no natural connection to a stadium" (Avella, 131 AD3d at 85), history suggests that shopping areas and public markets are frequently located alongside athletic stadiums.  The largest and earliest stadium in ancient Rome, the Circus Maximus, demonstrates this fact.  As early as the sixth century B.C., shops existed adjacent to the Circus Maximus to serve the needs of the spectators; similarly, when the Romans conquered the Greeks, they renovated the stadium at Olympia and built inns and shops in the area.

The practical realities regarding modern stadiums further support reversal as stadiums are frequently accompanied by malls or retail centers, adjacent to or near the sporting venues, to provide avenues for commerce and recreation that complement stadium attractions.  Camden Yards in Baltimore, Gillette Stadium in Foxboro, Massachusetts, and Busch Stadium in St. Louis are all examples of the modern trend of using stadiums as hubs for economic activity.  In fact, the author of an April 2017 article that discussed the evolution of stadium design over the last forty years commented that "[f]rom pedestrian plazas to full-blown entertainment districts, the stadium projects of today are about much more than the game."[6]  To be sure, Administrative Code § 18-118 envisioned that a stadium would be located on the

---

[6] Paul Steinbach, *Stadium Design Evolution from 1977 to 2017*, Athletic Business, April 2017, http://www.athleticbusiness.com/stadium-arena/stadium-design-evolution-from-1977-to-2017.html [accessed May 30, 2017].

parkland.  But, as we have previously held, we should not assume
that legislators intend "to confine the scope of their
legislation to the present, and to exclude all consideration for
the developments of the future" (Matter of Comptroller of City of
N.Y. v Mayor of City of N.Y., 7 NY3d 256, 266 [2006], quoting
Hudson Riv. Tel. Co. v Watervliet Turnpike & Ry. Co., 135 NY 393,
403-404 [1892]).[7]  The Appellate Division's outdated and
restrictive understanding of what is "natural[ly] connect[ed]" to
a stadium does the opposite, and should be rejected.

                              V.

        Our Court's fervent commitment to the public trust
doctrine and our appreciation of natural parkland in our State is
not undermined by a reversal in this case.  The legislature
expressly alienated the property at issue for non-park uses.
More precisely, the legislature directly allowed for future
development and use of this alienated parkland "for any purpose
or purposes which is of such a nature as to furnish to, or foster
or promote among, or provide for the benefit of, the people of
the city, recreation, entertainment, amusement, education,
enlightenment, cultural development or betterment, and
improvement of trade and commerce" (Administrative Code § 18-118
[b] [1]).  Permitting the Willets Point Plan to proceed certainly
does not put parks elsewhere in our State at risk of being

_____

    [7] That is particularly so where, as here, the statute
specifically contemplates and permits new contracts, leases,
agreements, and authorizations after the initial ones have
expired.

demolished and replaced with brick, mortar, and plastic. Instead, the proposed development has the potential to turn vacant lots into a vibrant community, transform parking lots into places of public use and enjoyment, and replace asphalt with hope and aspirations for the blighted community of Willets Point.

In sum, the majority's holding ignores the statute's plain text. The majority's narrow view that the statute authorizes only the construction of a stadium, or facilities directly related to a stadium, disregards the prescient and forward-looking nature of the statutory language. Willets West is designed to achieve the legislative objectives laid out expressly in the statute -- improvement of trade and commerce and the promotion of recreation, entertainment, amusement, and cultural betterment. If permitted, the development will be enjoyed by those going to Citi Field, as well as others seeking recreation, food, shops, and entertainment. An afternoon at the ballgame could become a day-long event, where families can shop, see a movie, and share a meal together. The New York State Legislature specifically allowed for this eventuality when it enacted the statute, and we should therefore find that the contemplated development of Willets West is an authorized use of this alienated parkland.

Accordingly, I dissent.

*    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

Order affirmed, with costs.  Opinion by Judge Wilson.  Judges
Rivera, Stein, Fahey and Garcia concur.  Chief Judge DiFiore
dissents in an opinion.


Decided June 6, 2017