OPINION OF THE COURT
Chief Judge Kaye.
The Croton Watershed — a series of interconnected reservoirs and lakes located primarily in Westchester, Dutchess and Putnam counties — is one of New York City’s three principal drinking water sources, supplying between 10 and 30% of the City’s requirements. In 1992, after preparing a report concluding that filtration would be necessary to ensure the safety of water from the Croton Watershed, the City entered into a stipulation with the New York State Department of Health, acknowledging that State and Federal law required it to build a filtration plant. The City agreed to complete design of a water treatment plant by July 1995, and complete construction by July 1999.
In 1993, the United States Environmental Protection Agency determined that the Surface Water Treatment Rule (40 CFR 141.70-141.75) required the City to filter and disinfect its Croton water supply. Without challenging the EPA’s determination, the City began designing a water treatment plant. Impatient with the City’s lack of progress, in 1997 the Federal government brought suit in the District Court for the Eastern District of New York against the City and its Department of Environmental Protection for violation of Federal law. The State intervened as a plaintiff, alleging noncompliance with the State Sanitary Code.
Recognizing that the public interest would be best served by resolving the litigation, the parties, in 1998, executed a consent decree requiring filtration and disinfection of the Croton water. The decree establishes 26 “milestones,” or deadlines, for stages of the water treatment plant, including a final Environmental Impact Statement and approvals under the City’s Uniform Land Use and Review Procedure by July 31, 1999; construction completion by September 1, 2006; and operation by March 1, *627 2007. Milestone 14 provides that by July 31, 1999 “in the event that use of the selected site for the [plant] requires state legislation, the City shall request state legislation and home rule message from the City Council.” Milestone 15 further specifies that any such legislation must be obtained by February 1, 2000. Failure to comply, under the consent decree, subjects the City to substantial penalties.
As designed, the water treatment plant is to be a 473,000 square foot industrial facility covering 23 acres, with a raw water pumping station, finished water pumping station and tunnel linking the plant to a distribution system near another reservoir. It will operate around the clock, seven days a week, filtering 290 million gallons of water and producing up to 61 tons of “dewatered sludge cake” daily. Once the plant is operational, the Croton water will be transported there for treatment, fluoridation, chlorination and distribution.
After considering several locations, in December 1998 the City announced that its preferred site was the Mosholu Golf Course in Van Cortlandt Park, the City’s third largest park, dedicated as parkland by an act of the Legislature in 1884 (see, L 1884, ch 522).[1] The Mosholu Golf Course is a year-round, nine-hole course and driving range regularly used by the public (in 1997, for example, approximately 33,000 rounds of golf were played there) as well as by schools and youth programs. It is the only City golf course directly accessible by subway.
According to the Environmental Impact Statement, construction at the Mosholu site is scheduled to last more than five years, during which time 28 acres of parkland — including the golf course and driving range — will be closed to the public, and will become an active construction site. Construction will require demolition of the clubhouse, roads and parking areas, which will later be restored. The driving range, however, will be rebuilt on the roof of the plant, above a layer of dirt. The Environmental Impact Statement further discloses that hundreds of trees and associated vegetation rare to New York City — whose “loss would represent a potential significant adverse impact” — are threatened by the construction, and a million cubic yards of soil and rock will be removed from the park. During peak construction, more than a thousand workers will be at the site, and hundreds of vehicles will deliver construction materials and remove soil.
*628 The plant will, moreover, change the gradient of the park. Though the plant is to be built underground in the sense that it will be below “finished grade,” its roof will be between five and 30 feet above existing ground elevation. Additionally, vents and air intake louvers placed in berms surrounding the facility will extend above finished grade.
In January 1999, shortly after site selection, the State Attorney General advised the City that, in his view, legislative approval was necessary before parkland could be used for this project. Citizen groups opposed the project, arguing it was not authorized by the State Legislature; 33 State legislators similarly urged that the City did not have authority to build the plant in Van Cortlandt Park without legislative permission.
On July 21, 1999, the City Council approved the application for plant construction at the Mosholu site. By letter dated July 30, 1999, the Attorney General reiterated that use of the proposed site without first obtaining legislative approval would violate State law, advising:
“construction of the Plant at the selected site in Van Cortlandt Park, a process which will include the closing of the golf course for six years, requires state legislation for the reasons we have discussed with counsel for the City beginning in January, 1999. We expect that the City will comply with [milestones 14 and 15] and request legislation and a home rule message from the City Council on or before July 31, 1999.”
The City has not sought legislative approval for the project.
Pursuant to the consent decree dispute resolution provision, the State sought relief in the District Court, claiming the City violated its commitment by failing to seek legislative approval for construction and operation of the water treatment plant. Concerned citizens and community groups, similarly, commenced two lawsuits in State Supreme Court — Friends of Van Cortlandt Park v City of New York and Norwood Community Action v Department of Envtl. Protection — seeking, among other things, to enjoin development and construction of the water treatment plant in Van Cortlandt Park on the ground that the City impermissibly sought to convert a considerable area of parkland from public use without an act of the State Legislature. Without objection, the two citizen suits were removed to the Eastern District, which had continuing jurisdiction under *629 the consent decree. All of the parties sought summary judgment.
The District Court granted the City’s motions, concluding that legislative approval was unnecessary. As the court explained, there being “no transfer of an interest in land to another entity * * * [and] no diminution of parkland available for public use after the plant is built, underground use of the parkland [was] not an alienation in the sense of diversion of parkland for non-park purposes” (United States v City of New York, 96 F Supp 2d 195, 204).
Plaintiffs’ appeals were consolidated. On June 30, 2000, plaintiffs State of New York and Friends of Van Cortlandt Park moved to certify to this Court the question whether State legislative approval is required for the proposed use of the Mosholu site. Mindful on the one hand of the desirability that this State law issue be resolved by the State Court of Appeals, and on the other hand of the burden certification of a time-sensitive issue would impose on us, on November 15, 2000 the Second Circuit granted plaintiffs’ motion, so long as this Court concluded it could expeditiously resolve the issue (232 F3d 324). On November 21, 2000 we accepted certification (95 NY2d 916), and now answer in the affirmative the following question: “Does any aspect of the proposed [water treatment plant] require state legislative approval?”[2]
We begin analysis with two points of agreement by the parties: that this water treatment plant is a non-park use, and that Williams v Gallatin (229 NY 248) is controlling precedent.
In Williams, a taxpayer sought to enjoin the New York City Commissioner of Parks from leasing the Central Park Arsenal Building to the Safety Institute of America, arguing the transaction was “foreign to park purposes” (id., at 250). The lease was for a 10-year term, cancellable if the City needed the property for park use. In prohibiting the lease, this Court explained that a park is a recreational pleasure area set aside to promote public health and welfare, and as such:
“no objects, however worthy, * * * which have no *630 connection with park purposes, should be permitted to encroach upon [parkland] without legislative authority plainly conferred. * * *
“The legislative will is that Central Park should be kept open as a public park ought to be and not be turned over by the commissioner of parks to other uses. It must be kept free from intrusion of every kind which would interfere in any degree with its complete use for this end” (id., at 253-254).
In the 80 years since Williams, our courts have time and again reaffirmed the principle that parkland is impressed with a public trust,[3] requiring legislative approval before it can be alienated or used for an extended period for non-park purposes (see, Miller v City of New York, 15 NY2d 34, 37 [20-year lease]; Incorporated Vil. of Lloyd Harbor v Town of Huntington, 4 NY2d 182, 190; Matter of Ackerman v Steisel, 104 AD2d 940, 941 [2d Dept] [storage of sanitation vehicles and equipment], affd 66 NY2d 833; Stephenson v County of Monroe, 43 AD2d 897 [4th Dept]; Aldrich v City of New York, 208 Misc 930, 939 [Sup Ct, Queens County], affd 2 AD2d 760 [2d Dept]; Matter of Central Parkway, 140 Misc 727, 729 [Sup Ct, Schenectady County]; contrast, 795 Fifth Ave. Corp. v City of New York, 15 NY2d 221, 225 [Park Commissioner properly determined that a café and restaurant could be constructed in Central Park where the project furthered park purposes]).
Where the parties disagree is as to application of these longstanding precedents to the present facts. The City argues that, even under Williams, legislative approval is not required, first, because there will be no alienation of parkland and second, because the plant will be substantially underground, with park surfaces fully restored, and therefore the proposed use is not inconsistent with park purposes. Both arguments lack merit.
Williams makes clear that legislative approval is required when there is a substantial intrusion on parkland for non-park purposes, regardless of whether there has been an outright conveyance of title and regardless of whether the parkland is ultimately to be restored. Indeed, in Williams itself there was no divestiture of ownership — there was a 10-year lease cancella *631 ble by the City — and upon expiration of the lease the property could return to park use. Nonetheless, without legislative approval the lease was prohibited.
Bates v Holbrook (171 NY 460, 465-468) — which predated Williams — is also instructive. There, the City Department of Parks permitted construction of storage buildings on parkland in connection with a subway project. Because the Legislature allowed the Department to grant “temporary privileges” for use of park property to facilitate construction, defendants urged that the structures were authorized. This Court disagreed, concluding no “direct legislative authority” warranted invasion of the park (id., at 467). Structures could not be considered “temporary” vdien “authorized to remain until the completion of the work” on a project that would take at least three years (id., at 468).
Here, the public will be deprived of valued park uses for at least five years, as plant construction proceeds. While there may be “de minimis” exceptions from the public trust doctrine, the magnitude of the proposed project does not call upon us to draw such lines in this case.
For much the same reason, we also need not resolve the interrelated question whether an underground installation that in no way intrudes on park use requires legislative approval. That an appreciable area of the park will be closed for more than five years, and that some future uses of the land will be inhibited by the presence of the underground structure, render that issue hypothetical. Those factors also set apart Wigand v City of New York (NYLJ, Sept. 25, 1967, at 21, col 5), a 1967 unreported Richmond County Supreme Court decision, on which the City and the District Court rely. In Wigand, the trial court authorized use of parkland to facilitate installation of two underground water tanks, after which the area was to be completely restored “with beautification greater than that which originally existed” and 27 acres of parkland added. While Wigand is distinguishable on several grounds, to the extent it is inconsistent with our decision today, it should not be followed.
Though the water treatment plant plainly serves an important public purpose — indeed, even the State Attorney General believes it should be built at the site selected (see, United States v City of New York, supra, 96 F Supp 2d, at 203) — our law is well settled: dedicated park areas in New York are impressed with a public trust for the benefit of the people of the State. *632 Their “use for other than park purposes, either for a period of years or permanently, requires the direct and specific approval of the State Legislature, plainly conferred” (Ackerman v Steisel, supra, 104 AD2d, at 941, affd 66 NY2d 833; see also, Potter v Collis, 156 NY 16, 30 [where a municipality holds title to land for public use “the power to regulate those uses (is) vested solely in the legislature”]). That proposition is reflected both in our case law and in our statutes (see, e.g., L 1989, ch 533 [easements over parkland for construction, operation and maintenance of water treatment facility]; L 1998, ch 209 [easements in Webster Park for construction, operation and maintenance of sanitary sewer system facilities]; L 1994, ch 341 [parkland in Town of Waverly necessary for sewer district]; L 1994, ch 534 [easements in Towns of Fleming and Owasco for water mains]).
Finally, we reach this conclusion as a matter of common law, without the need to address General City Law § 20 (2).
Accordingly, the certified question should be answered in the affirmative.
Judges Smith, Levine, Ciparick, Wesley, Rosenblatt and Graffeo concur.
Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.17 of the Rules of the Court of Appeals (22 NYCRR 500.17), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question answered in the affirmative.

. The Legislature authorized the City, through the Department of Public Parks, to take parcels of land designated as Van Cortlandt Park “for public use” as a park (L 1884, ch 522, §§ 1, 2).

. The Second Circuit added that the certified question might subsume two questions: “Is state legislative approval required for the City to place the proposed [water treatment plant] underneath Van Cortlandt Park, and, if not, is state legislative approval required before the City may withdraw from parkland use the amount of parkland that will be interfered with by construction of the proposed [plant] for the time currently estimated to restore the parkland to park use?” (232 F3d, at 327.) Our response makes it unnecessary to address these subsidiary questions.

. While the parties’ focus is on Williams, the public trust doctrine is rooted in much earlier history (see, Brooklyn Park Commrs. v Armstrong, 45 NY 234, 243; see also, 11 Powell, Real Property § 79.02 [3], at 79-10 — 79-11; David C. Slade et al., Putting the Public Trust Doctrine to Work, at 3-4 [1990]).