*429 OPINION OF THE COURT
Wilson, J.
Plaintiffs — a state senator, not-for-profit organizations, businesses, taxpayers, and users of Flushing Meadows Park, brought this hybrid CPLR article 78 proceeding and declaratory judgment action in Supreme Court seeking to enjoin the proposed development of parkland in Queens. The proposed development, “Willets West,” involves the construction of a shopping mall and movie theater on Citi Field’s parking lot, where Shea Stadium once stood.
Following New York’s loss of both the Dodgers and Giants, Mayor Wagner, determined that New York City should have a National League Team, formed a Baseball Committee, led by William Shea, to work with Major League Baseball and others to obtain an expansion franchise for New York City. Major League Baseball approved the issuance of a franchise to the New York Metropolitan Baseball Club, conditioned upon the club’s ability to secure the rights to use of a stadium that met League specifications (see Off of Mayor, Supp Mem in Support, Bill Jacket, L 1961, ch 729 at 41). In 1961, the state legislature enacted a law providing for the financing and use of a municipal baseball stadium within Flushing Meadows Park, later named Shea Stadium. As the State Department of Commerce noted in a memorandum supporting the bill, “[t]h[e] legislation [wa]s needed in order to get a second major league baseball team in New York City” (Bill Jacket, L 1961, ch 729 at 15). Shea Stadium was home to the New York Mets for nearly 50 years, before it was demolished in 2008 and replaced with a new stadium, Citi Field.
To the east of the parkland is an area known as Willets Point. As the Appellate Division noted, and as the parties agree, “Wil-lets Point is a 61-acre area that has long been considered by the City to be blighted. Indeed, Willets Point has no sewers, sidewalks or streetlights, is replete with potholed and rutted streets, and is prone to flooding” (131 AD3d 77, 78 [1st Dept 2015]). Prior proposals to remediate and develop Willets Point have foundered.
*430 In response to the City’s request for proposals, in 2011, defendant Queens Development Group, LLC (QDG),[1] proposed a two-phase project for developing Willets Point. The current Willets Point Plan calls for construction, in several staged phases, of retail space, a hotel, an outdoor space, a public school, and affordable housing in the Willets Point neighborhood, and the construction of a large-scale retail complex on the parkland of Willets West. QDG included Willets West in the development proposal under the theory that “the creation of a retail and entertainment center at Willets West w[ould] spur a critical perception change of Willets Point, establishing a sense of place and making it a destination where people want to live, work, and visit.”
The phases of the planned development project are as follows: Phase 1A, which was set to begin in 2015, included the construction of Willets West. That phase calls for a retail mall to be built on parkland — which is currently Citi Field’s parking lot — and would include over 200 retail stores and restaurants, as well as a movie theater. Phase 1A would also include the installation of sewage systems, roads and ramps, and a hotel in Willets Point. Phase IB, expected to begin in 2026, would include construction of 2,490 housing units (35% of which would be affordable), a public school, and open outdoor space. Under the agreement between QDG and the New York City Economic Development Corporation, QDG could avoid phase IB by paying $35 million. The City approved QDG’s proposal in May of 2012.
Thereafter, plaintiffs commenced the instant action against defendants including, among others, the City, various municipal officers and entities, and QDG, alleging that because the Willets West development was located within parkland, the public trust doctrine required legislative authorization, which had not been granted. Supreme Court denied the petition for declaratory and injunctive relief and dismissed the proceeding. The Appellate Division unanimously reversed and granted the petition “to the extent of declaring that construction of Willets West on City parkland without the authorization of the state legislature violates the public trust doctrine, and enjoining any further steps toward its construction” (131 AD3d at 87). We *431 granted defendant QDG and related entities leave to appeal (26 NY3d 912 [2015] ).[2] We now affirm.
I.
There is no dispute that the Willets West development is proposed to be constructed entirely on city parkland. The public trust doctrine is ancient and firmly established in our precedent. In Brooklyn Park Commrs. v Armstrong we held that, when a municipality takes land “for the public use as a park, . . . [it holds] it in trust for that purpose . . . Receiving the title in trust for an especial public use, [the municipality] could not convey [the land] without the sanction of the legislature” (45 NY 234, 243 [1871]). Likewise, in Matter of Boston & Albany R.R. Co., we held that parklands held by a village were held “upon a special trust and for public use. The village could not dispose of them or divert them from the purpose to which they were dedicated” (53 NY 574, 576 [1873]). Summarizing the long-standing history of the public trust doctrine in Friends of Van Cortlandt Park v City of New York, we explained that “our courts have time and again reaffirmed the principle that parkland is impressed with a public trust, requiring legislative approval before it can be alienated or used for an extended period for non-park purposes” (95 NY2d 623, 630 [2001]).
Only the state legislature has the power to alienate parkland (or other lands held in the public trust) for purposes other than those for which they have been designated. The parties here agree with that proposition. Even though a municipality may own the land dedicated to public use, “the title of the municipal corporation to the public streets [is] held in trust for the public and the power to regulate those uses [is] vested solely in the legislature” (Potter v Collis, 156 NY 16, 30 [1898]).
The approval of the legislature in alienating parkland must be “plainly conferred” through the “direct and specific approval of the State Legislature” (Friends of Van Cortlandt Park, 95 NY2d at 632 [internal quotation marks and citation omitted]; see Capruso v Village of Kings Point, 23 NY3d 631, 639 [2014]; Williams v Gallatin, 229 NY 248, 253 [1920]). Although we have often articulated that principle in the context of an initial alienation of lands held in the public trust (see e.g. Friends of Van Cortlandt Park, 95 NY2d at 631), the principle also *432 requires that a proposed use of parkland falls within the scope of legislative authorization once granted. For example, in Potter v Collis, we held that, although the legislature’s General Railroad Act of 1850 authorized municipalities to assent to the construction of railroads, that legislative authorization was not “sufficient to authorize a city street railroad,” and the City’s resolution granting a third party authorization to construct a railroad on public streets was therefore invalid under the public trust doctrine (156 NY at 30). As we held in Matter of City of New York, which involved New York City’s right to alienate piers and wharves held in the public trust, “[w]hen there is a fair, reasonable and substantial doubt concerning the existence of an alleged power in a municipality, the power should be denied” (228 NY 140, 152 [1920]). We reiterated that rule in Lake George Steamboat Co. v Blais, in which we said, “legislative sanction must be clear and certain to permit a municipality to lease public property for private purposes” (30 NY2d 48, 52 [1972]).
Keeping in mind that the current proposed alienation must plainly fall within the scope of the legislative direction authorizing alienation of the parklands at issue, we now turn to an examination of the statute relied on by defendants for the legislative authorization of Willets West.
IL
Defendants contend that the 1961 legislation concerning Shea Stadium, which the City constructed on parkland, constitutes legislative authorization for the Willets West development. That legislation, codified in section 18-118 of the Administrative Code of the City of New York, is titled: “Renting of stadium in Flushing Meadow park; exemption from down payment requirements.” Section 18-118 (a) provides, as relevant here:
“a. Notwithstanding any other provision of law, general, special or local, the city ... is hereby authorized and empowered from time to time to enter into contracts, leases or rental agreements with, or grant licenses, permits, concessions or other authorizations to, any person or persons, upon such terms and conditions, for such consideration, and for such term of duration as may be agreed upon by the city and such person or persons, whereby *433 such person or persons are granted the right, for any purpose or purposes referred to in subdivision b of this section, to use, occupy or carry on activities in, the whole or any part of a stadium, with appurtenant grounds, parking areas and other facilities, to be constructed by the city on certain tracts of land described in subdivision c of this section, being a part of Flushing Meadow park . . . Prior to or after the expiration or termination of the terms of duration of any contracts, leases, rental agreements, licenses, permits, concessions or other authorizations entered into or granted pursuant to the provisions of this subdivision and subdivision b of this section, the city, in accordance with the requirements and conditions of this subdivision and subdivision b of this section, may from time to time enter into amended, new, additional or further contracts, leases or rental agreements with, and grant new, additional or further licenses, permits, concessions or other authorizations to, the same or any other person or persons for any purpose or purposes referred to in subdivision b of this section.”
Section 18-118 (b), in turn, provides:
“b. Any contract, lease, rental agreement, license, permit, concession or other authorization referred to in subdivision a of this section may grant to the person or persons contracting with the city thereunder, the right to use, occupy or carry on activities in, the whole or any part of such stadium, grounds, parking areas and other facilities, (1) for any purpose or purposes which is of such a nature as to furnish to, or foster or promote among, or provide for the benefit of, the people of the city, recreation, entertainment, amusement, education, enlightenment, cultural development or betterment, and improvement of trade and commerce, including professional, amateur and scholastic sports and athletic events, theatrical, musical or other entertainment presentations, and meetings, assemblages, conventions and exhibitions for any purpose, including meetings, assemblages, conventions and exhibitions held for business or trade purposes, and *434 other events of civic, community and general public interest, and/or (2) for any business or commercial purpose which aids in the financing of the construction and operation of such stadium, grounds, parking areas and facilities, and any additions, alterations or improvements thereto, or to the equipment thereof, and which does not interfere with the accomplishment of the purposes referred to in paragraph one of this subdivision. It is hereby declared that all of the purposes referred to in this subdivision are for the benefit of the people of the city and for the improvement of their health, welfare, recreation and prosperity, for the promotion of competitive sports for youth and the prevention of juvenile delinquency, and for the improvement of trade and commerce, and are hereby declared to be public purposes.”
When interpreting a statute, “our primary consideration is to discern and give effect to the Legislature’s intention” (Matter of Albany Law School v New York State Off. of Mental Retardation & Dev. Disabilities, 19 NY3d 106, 120 [2012]). The text of a statute is the “clearest indicator” of such legislative intent and “courts should construe unambiguous language to give effect to its plain meaning” (Matter of DaimlerChrysler Corp. v Spitzer, 7 NY3d 653, 660 [2006]). We have also previously instructed that “[i]t is an accepted rule that all parts of a statute are intended to be given effect and that a statutory construction which renders one part meaningless should be avoided” (Rocovich v Consolidated Edison Co., 78 NY2d 509, 515 [1991]). Furthermore, “a statute . . . must be construed as a whole and ... its various sections must be considered together and with reference to each other” (Matter of New York County Lawyers’ Assn, v Bloomberg, 19 NY3d 712, 721 [2012]). Defendants’ argument disregards these fundamental rules of statutory interpretation.
Beginning with the plain language, subdivision (a) of section 18-118 grants the City the right to “enter into contracts, leases or rental agreements,” etc., for persons wishing “to use, occupy or carry on activities in, the whole or any part of a stadium, with appurtenant grounds, parking areas and other facilities” (emphasis added). Nothing in that language authorizes the construction of a shopping mall or movie theater; rather, it authorizes the City to enter into agreements permitting others *435 to use the stadium and its appurtenant facilities.[3] The term “appurtenant” means “[a]nnexed to a more important thing,” (Black’s Law Dictionary [10th ed 2014], appurtenant); or “constituting a legal accompaniment” or “auxiliary, accessory” to something else (Merriam-Webster Online Dictionary, appurtenant [https://www.merriam-webster.com/dictionary/ appurtenant] [accessed May 17, 2017]). Accordingly, the clear implication of the reference to “appurtenant . . . facilities” is that any such facilities must be related to, part of, belonging to, or serving some purpose for, the stadium itself.
Defendants point to the last sentence of subdivision (a), authorizing “the city, in accordance with the requirements and conditions of this subdivision and subdivision b of this section, [to] . . . enter into amended, new, additional or further contracts, leases or rental agreements . . . for any purpose or purposes referred to in subdivision b of this section,” arguing that subdivision (b) specifically authorizes this type of development on the parkland because one of the enumerated uses allowed is the “improvement of trade and commerce” (Administrative Code of City of NY § 18-118 [a], [b] [1]). That argument is also unpersuasive.[4] The purposes enumerated in the legislation are consistent with typical uses of a park and/or stadium, including “scholastic sports and athletic events,” “theatrical, *436 musical or other entertainment presentations,” and “meetings, assemblages, conventions and exhibitions.”
Subdivision (b), like subdivision (a), is limited to agreements the City might enter into for “the right to use, occupy or carry on activities in, the whole or any part of such stadium, grounds, parking areas and other facilities.” Here, “other facilities” in subdivision (b) cannot be divorced from its statutory context: “appurtenant grounds, parking areas and other facilities, to be constructed by the city,” to be read as a legislative grant to authorize the private construction of anything deemed by the City to improve trade and commerce. Just as a general statute authorizing municipalities to construct railroads on lands held in the public trust did not authorize New York City to construct a street railroad, the 1961 legislation does not authorize the construction of a retail complex and movie theater.
Reading “improvement of trade and commerce” as the City suggests — namely, as authorization for the construction of anything that might improve trade or commerce — would lead to an absurd result. The purposes enumerated in (b) (1) could not be read to exclude any use of the parkland, if understood to mean that the land can be used for any purpose at all related to the “improvement of trade and commerce” or “education,” “amusement,” “cultural development” or “enlightenment” (Administrative Code of City of NY § 18-118 [b] [1]). For example, defendants’ interpretation of the statute would permit the conversion of the parkland into a second Times Square or Wall Street, which is decidedly not evidenced in the statutory language. Moreover, had the legislature truly intended to authorize any use of the parkland, including private for-profit business enterprises, those portions of the statute describing the authorized uses would be rendered superfluous.[5]
*437 Defendants point to the differences between the 1961 legislation and the 2005 legislation authorizing the development of the new Yankee Stadium, arguing that when the legislature wanted to restrict its authorization to “development of a baseball stadium,” it knew how to do so. That argument misses the mark for several reasons.
First, that the legislature used different words in 2005 does not shed any real light on what the 1961 legislature meant. Second, the language cited by defendants from the 2005 Yankee Stadium legislation, restricting the legislative grant to “contracts, leases or rental agreements for a term not to exceed ninety-nine years, with the New York Yankees Limited Partnership, its affiliate and/or another entity or entities . . . for the purpose of developing, maintaining and operating thereon a professional baseball stadium and related facilities” would have been inapposite as to Shea Stadium, which was conceived as a multipurpose stadium that the City was free to lease to others (and which in fact housed the New York Jets football team from 1964-1983) (L 2005, ch 238, § 2 [a]- [b] [emphasis in defendants’ brief]).
Defendants also contend that, whereas the 2005 Yankee Stadium legislation limits the City’s authority to “stadium and related facilities,” the 1961 legislation does not. However, the 1961 legislation limits the City’s legislation to “appurtenant grounds, parking areas and other facilities,” and we perceive no difference between “appurtenant” and “stadium related” in the context of these statutes.
III.
The plain language of the statute does not authorize the proposed construction, and we therefore need not consider the legislative history. However, that history also unambiguously demonstrates that the legislature did not authorize the City to do more than enter into agreements for use of the stadium for public — not commercial — purposes and avoid certain restrictions to ease the financial burden on the City of constructing the stadium.
As a starting point, the title of the statute, “Renting of a stadium in Flushing Meadow park; exemption from down payment requirements,” suggests nothing at all about legislative *438 authorization for anything other than a stadium and, indeed, pertains only to the renting of the stadium and exemption from statutory requirements that would have required a down payment. Although the title of the legislation may not “trump the clear language of the statute,” it “may help in ascertaining the [legislative] intent” (Matter of Suffolk Regional Off-Track Betting Corp. v New York State Racing & Wagering Bd., 11 NY3d 559, 571 [2008]; see McKinney’s Cons Laws of NY, Book 1, Statutes § 123).
Consistent with the bill’s title, the legislative history demonstrates that the statute was intended to authorize the lease, rental or licensing of the stadium, not the construction of unrelated facilities. A Memorandum in Support of the bill from the Mayor’s Office wrote that the bill
“would authorize the City ... to lease or rent, from time to time, for customary municipal stadium purposes, the 55,000-seat stadium with 5,500 parking places . . . proposed to be constructed by the City in Flushing Meadow Park, Borough of Queens, upon such terms and conditions ... as may be agreed upon by the City and the persons leasing or renting the stadium” (Bill Jacket, L 1961, ch 729 at 32).
The City did not explain the need for the legislation in terms of authorization for the construction of anything at all — even a stadium; instead, the memorandum explained:
“[s]ince the stadium is to be located on park lands, and since such lands are inalienable under the provisions of § 383 of the City Charter, the City will be unable to lease or rent the stadium for customary stadium purposes . . . without authorization by the Legislature. Moreover, without such authorization, the City will be unable to operate the stadium suitably as a revenue-producing project” (id. at 33 [emphasis added]).
Thus, the City requested the legislation to grant it the right to rent the stadium to private entities, not to construct new and unrelated facilities for private business purposes.
In Williams v Gallatin, we noted that “park purposes” may include “playing grounds,” which “contribute to the use and enjoyment of the park” (229 NY 248, 253-254 [1920]). A municipality may, without legislative authorization, make *439 improvements to a park that are consistent with its status as “a pleasure ground set apart for recreation of the public, to promote its health and enjoyment. It need not and should not be a mere field or open space” (id. [citation omitted]). Our observation that municipalities may improve parks without legislative authorization by, among other things, the construction of playing fields, is consistent with the statutory language and legislative history of the 1961 legislation at issue here. The City explained:
“This bill would confer upon the City the leasing and renting powers necessary to make the stadium available for professional, amateur and scholastic sports and athletic events and entertainment presentations, and the holding of meetings, conventions, exhibitions and events of civic, cultural and community interest. Such powers are essential to enable the City to cooperate in the establishment of a new National League baseball team in the City, and to operate the stadium as a revenue-producing project which, as is explained below, will be substantially self-sustaining” (Off of Mayor, Supp Mem in Support, Bill Jacket, L 1961, ch 729 at 38).
Thus, the City sought legislative approval because rental — not construction — of the stadium constituted an alienation.[6] Legislative authorization to rent Shea Stadium and its grounds to private parties cannot, under our long-standing construction of the public trust doctrine, constitute legislative authorization to build a shopping mall or movie theater.[7]
The budget report on the bill stated that “[t]he bill grants statutory authority for the City to lease or rent the stadium *440 which could not otherwise be leased or rented because of its location on inalienable park lands” (Bill Jacket, L 1961, ch 729 at 27). A report on the bill from the Department of Audit and Control, addressed to the Governor, describes each subsection of the bill: paragraph (a), it says, “authorizes the Commissioner of Parks, with the approval of the Board of Estimate, to enter into contracts, leases or rental agreements . . . , or grant licenses, permits, concessions or other authorizations for the use of the whole or any part of the new stadium” (Bill Jacket, L 1961, ch 729 at 28). The report then writes that “Paragraph b describes the purposes for which such use may be granted” (id.).
The statutory language and legislative history demonstrate that the legislation did not authorize further developments on the tract of parkland but, rather, ensured that the City was authorized to accommodate other public uses of the stadium and appurtenant facilities.
IV.
In sum, the text of the statute and its legislative history flatly refute the proposition that the legislature granted the City the authority to construct a development such as Willets West in Flushing Meadows Park.
We acknowledge that the remediation of Willets Point is a laudable goal. Defendants and various amici dedicate substantial portions of their briefs to the propositions that the Willets West development would immensely benefit the people of New York City, by transforming the area into a new, vibrant community, and that the present plan might be the only means to accomplish that transformation. Those contentions, however, have no place in our consideration of whether the legislature granted authorization for the development of Willets West on land held in the public trust. Of course, the legislature remains free to alienate all or part of the parkland for whatever purposes it sees fit, but it must do so through direct and specific legislation that expressly confers the desired alienation.
Plaintiffs’ additional claims are rendered academic by our decision. Accordingly, the order of the Appellate Division should be affirmed, with costs.

. QDG is a joint venture formed .by entities controlled by the Sterling Equities Associates, owner of the Mets, and The Related Companies, L.R, a real estate development firm.

. The City did not seek leave to appeal in this case, but filed a brief in support of reversal.

. Supreme Court relied on Murphy v Erie County (28 NY2d 80 [1971]) for the proposition that a “municipality may lease improvements to property to a private operator, on the condition that it serves a public purpose, and that ownership of the improvement is retained by the municipality.” In Murphy, the authorizing legislation, much like the statute here, allowed the county to “enter into contracts, leases, or rental agreements with, or grant licenses, permits, concessions, or other authorizations, to any person or persons.” We held: “Quite obviously, it was designed to give the county the broadest latitude possible in the operation of the stadium” {id. at 87). Nothing in Murphy suggests that a grant of legislative authority to lease a stadium located in parkland to a private business constitutes a legislative grant to allow private businesses to build unrelated commercial enterprises on the parkland.

. On its face, the statute permits use of the stadium and facilities for, among other things, the improvement of trade and commerce. It does not permit, however, the construction of other facilities for the purpose of improving trade and commerce. Even if the statutory language were ambiguous, “Guided by the familiar canon of construction of noscitur a sociis, we ordinarily interpret the meaning of an ambiguous word in relation to the meanings of adjacent words” (Matter of Kese Indus. v Roslyn Torah Found., 15 NY3d 485, 491 [2010]; see State of New York v Mobil Oil Corp., 38 NY2d 460, 464 [1976]) and, following that canon, the phrase “improvement of trade and commerce” (Administrative Code of City of NY § 18-118 [b] [1]) — in light of the examples given and the other purposes listed in the statute — cannot rea *436 sonably be interpreted to encompass a private for-profit enterprise constructing an entirely new development on the parkland.

. The incompatibility between defendants’ proposed use and the authorization provided by the statute is also illustrated by reference to subdivision (b) (2) of section 18-118. That subdivision authorizes leases for “any business or commercial purpose which aids in the financing of the construction and operation of such stadium, grounds, parking areas and facilities.” This plainly refers to private for-profit enterprises, but applies only where the purposes aid in the financing of the stadium, which compels the conclusion that “business or commercial purpose [s]” are not authorized where the businesses or commercial use does not aid in the financing of the stadium (Administrative Code of City of NY § 18-118 [b] [2]; see generally Two Guys from Harrison-N.Y. v S.F.R. Realty Assoc., 63 NY2d 396, 404 [1984] [“specification of certain *437 permitted activities . . . should be read as implicitly prohibiting other(s)” under doctrine of “inclusio unius est exclusio alterius”]).

. Likewise, the bill jacket contains a telegram from William Shea to Governor Nelson Rockefeller, sent in anticipation of the legislation’s passage, which said, “the approval by the state legislature of the leasing of the stadium is our last step” (Bill Jacket, L 1961, ch 729 at 8-9). In a memorandum summarizing the bill, the New York State Department of Commerce wrote that its purpose was to amend the code “in relation to financing the construction of a stadium to be erected by the City of New York . . . and authorizing, in aid of such financing, the renting of such a stadium and exemption from down payment requirements” (Bill Jacket, L 1961, ch 729 at 15).

. The other legislative approval required by the City, captured in subdivision (e), related to the City’s need for an exemption from the down-payment requirement of section 107.00 of the Local Finance Law, “[bjecause of the impracticability of issuing 15-year bonds, and because of the indicated minor deficits preventing operation of the stadium on a fully self-sustaining basis initially” (Off of Mayor, Supp Mem in Support, Bill Jacket, L 1961, ch 729 at 40; see generally id. at 38-40).