Matter of East Riv. Park Action v City of New York (2021 NY Slip Op 06652)





Matter of East Riv. Park Action v City of New York


2021 NY Slip Op 06652


Decided on November 30, 2021


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: November 30, 2021
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Rolando T. Acosta
Judith Gische Anil C. Singh Saliann Scarpulla Manuel Mendez


Index No. 151491/20 Appeal No. 14669 Case No. 2021-00421 

[*1]In the Matter of East River Park Action, etc., et al., Petitioners-Appellants,
v
City of New York, Respondent-Respondent.



Petitioners appeal from the judgment of the Supreme Court, New York County (Melissa A. Crane, J.), entered August 20, 2020 denying the petition to annul a November 14, 2019 vote of the City Council, which modified the Zoning Resolution in order to facilitate the development of the East Side Coastal Resiliency Project, and dismissing the proceeding brought pursuant to CPLR article 78.




Advocates for Justice, New York (Arthur Z. Schwartz of counsel), for appellants.
Georgia M. Pestana, Corporation Counsel, New York (Mackenzie Fillow and Devin Slack of counsel), for respondent.



GISCHE, J.P. 


Under the public trust doctrine, where a public project utilizes park land for other than a park purpose, approval by the New York State legislature is required (Friends of Van Cortland Park v City of New York, 95 NY2d 623 [2001]). On this appeal, we are asked to consider whether a public services project that benefits both a park and the surrounding community satisfies the "park purpose" requirement, thereby exempting respondent (the City) from obtaining prior state approval. We hold that the project at issue, a coastal flood protection system, which has the dual purpose of benefiting the park and the surrounding community, serves a "park purpose" exempting it from obtaining prior state approval under the public trust doctrine.
Petitioners, 100 individuals and 20 community organizations who use East River Park (Park), seek a declaratory judgment nullifying approval by the New York City Council of a coastal flood protection project affecting the Park. East River Park, built in 1939, is 57 ½ acres of parkland along the waterfront of the Lower East Side of Manhattan. The New York City Parks Department's website describes East River Park as "[o]ne of New York City's finest places to play" (https://www.nycgovparks.org/parks/east-river-park [last accessed November 22, 2021]). Its facilities include a running track, tennis complex, eight baseball and softball fields, lawns, gardens, bicycle paths, fitness equipment, a seal sculpture water park, and many other facilities. An overpass at 10th Street that crosses over the FDR Drive, connects the Park to several nearby low-income housing developments and the rest of the Lower East Side. Neighborhoods immediately served by the Park have one of the largest concentrations of low- and moderate-income households in the City, with over 12,707 New York City Housing Authority housing units.
East River Park is a combination of parkland and landfill. It was built atop a bulkhead immediately adjacent to the East River, a salt water estuary. The multilane FDR drive runs parallel to the Park. When Superstorm Sandy struck the New York region in October 2012, the storm surge was so forceful that the East River not only crested over the bulkhead and completely flooded the Park, but it also crossed over the FDR drive, flowing inland several blocks west, reaching nearby housing developments. The water was reportedly four feet [*2]deep in many places, flooding homes and businesses, and damaging parts of the local infrastructure, including the energy grid, water and sewer facilities, and transportation systems. A Con Edison electrical substation was severely damaged, shutting down electrical service to much of lower Manhattan for days.
Given the corrosive nature of the salt water, the Park's energy, water supply systems, and drainage infrastructures were severely damaged by Sandy as well. Many of its trees, plant life and lawns were destroyed and some of the Park's historic structures suffered salt water damage. The City warns that Superstorm Sandy was a wakeup call, and a harbinger of things to come, because the Park's bulkhead is degraded, and that with continued degradation it may altogether collapse. Relying in part on the Federal Emergency Management Agency's (FEMA) 100-year floodplain elevation map,[FN1] which incorporates wave height assumptions and predictions of elevated sea levels, the City argues that without flood protection, future storm surges will destroy the Park.
In 2013, The Unites States Department of Housing and Urban Development (HUD) solicited proposals for redeveloping vulnerable flood areas. Manhattan's proposal, nicknamed the "Big U," was accepted. The proposal called for the development of a coastal protection system in three areas, referred to as "compartments." Working together, the City and HUD jointly funded the East Side Coastal Resiliency Project (ESCRP) encompassing the area at issue in this appeal, which extends from East 23rd Street to Montgomery Street. It includes the East River Park and immediately adjacent residential communities. The stated overarching objective of the ESCRP is to reduce flood risk in this area due to coastal storms and sea level rise on Manhattan's East Side, including the Lower East Side.
In October 2015, the City in conjunction with HUD prepared a draft environmental statement and issued a Draft Scope of Work (DSW) describing the proposed project to advance coastal resiliency along Manhattan's East Side to mitigate against expected future flooding from events like Superstorm Sandy. The Parks Department was the lead agency for the proposed project, responsible for fulfilling the environmental review requirements of the State Environmental Quality Review Act and the City Environmental Quality Review process, because the project would be largely located within City parkland. The DSW was made available for public review and comments; it included four proposed action alternatives. As concerned the Park, the DSW stated that the objectives were to "improve the Park's open spaces and enhance public access to it" and "[to] improv[e] the ecology and long-term resiliency of the East River Park." The DSW identified those aspects of the proposed action that required environmental review, described the review process, and addressed the steps that would be taken to obtain input from the public at large and community leaders[*3]. The DSW also stated that depending on the design alternative eventually selected, "the Proposed Action may also require an approval from the New York State Legislature to alienate portions of parkland within East River Park for nonpark uses."[FN2] Alternative three, first favored by the City, proposed flood protection using a combination of berms,[FN3] floodwalls constructed of steel, deployable systems such as swing, roller and crest gates, and sewer system improvements. A lengthy review process ensued, lasting several years. In addition to environmental studies, the City conducted workshops, held community board meetings, and solicited other forms of public input.
In September 2018, however, the City changed course and scrapped its plan of using berms and other raised barriers to protect the Park and surrounding areas.[FN4] It decided, instead, to embrace a fourth design alternative that was simply identified as "a flood protection system with integrated park facility resiliency measures." This alternative, referred to by the City as the "preferred alternative" called for most of East River Park to be raised eight to nine feet above its current elevation with a below-grade flood protection structure running parallel to the existing East River Park bulkhead. The planned elevation would essentially raise the entire Park above FEMA's current 100-year floodplain and the predicted year 2050 100-year floodplain. This alternative requires the full reconstruction and reconfiguration of the Park.
In April 2019, OMB and the Parks Department prepared a Final Scope of Work and there was further environmental review and community input. In June 2019 Uniform Land Use Review Process applications were referred to the Manhattan borough board for review, and in July 2019, the Manhattan borough president recommended approval of the proposed project with conditions. In December 2019, the New York City Council voted to approve the alternative design.
It is anticipated that the project will take as long as five years to complete (a timeframe petitioners reject as a "pie in the sky"), and the construction will take place in two phases. Phase one involves one portion of the Park, was originally scheduled to begin in the fall of 2020 and be completed by the spring 2023. Phase two involves a different portion of the Park, scheduled to occur from spring 2023 to late 2025. The City anticipates that this will leave portions of the Park (at least 40%) open to the public during construction.
Briefly, some of the major design elements of the project implicating the Park include:
Installation of a below-grade flood protection structure running parallel to the existing East River Park bulkhead and elevating most of the park.
Reconstruction of the Tennis House, Track and Field House, and East 10th Street comfort station.
Reconstruction of the East River Esplanade to increase the deck elevation to match the newly raised park.
Building a new shared-use flyover bridge connecting the [*4]north end of East River Park with Captain Patrick J. Brown Walk.
Reconstructing the Corlears Hook Bridge over the FDR Drive and replacing the existing Delancey Street and East 10th Street Bridges.
Relocation of the two existing coves in the Park.
Relocation of the Park's water and sewer infrastructure.
A new nature play area.
Additional barbecue pits.
Transplantation of tress and the addition of new trees
Pile driving for the floodwall construction within the park, closer to the waterfront, further away from residential units
Moving the line of flood protection from the west side of East River Park further east toward the East River
Following adoption of the ESCRP by the City Council, petitioners commenced this article 78 proceeding. Petitioners claim the project required prior approval from the New York State legislature under the public trust doctrine because its purpose was to prevent coastal flooding in the surrounding community and not just the Park. They contend that the project will destroy the Park, not save it. They further argue that because park rejuvenation and restoration pursuant to the project will take many years to complete, during which large sections of the Park will be closed to the public for recreational use, this in itself is a diversion or alienation of East River Park for a nonpark purpose.
Supreme Court denied the petition and this appeal ensued.
The Parks Department is vested with "broad powers" for the care, maintenance of "all parks, squares and public places . . . all playgrounds, playground fixtures and other recreation properties" (New York City Charter [Charter] §§ 533[a][1], [9]; Union Sq. Park Community Coalition Inc. v New York City Dept. of Parks & Recreation, 22 NY3d 648, 655 [2014]). While broad, these powers are not boundless. "[P]arkland is impressed with a public trust, requiring legislative approval before it can be alienated or used for an extended period for a nonpark purpose" (Friends of Van Cortlandt Park v City of New York, 95 NY2d at 630 [footnote omitted]). The use of parkland for anything "other than a park purpose, either for a period of years or permanently, requires the direct and specific approval of the State Legislature" (id. at 632 [internal quotation marks omitted]). This inalienability preserves parkland as "pleasure ground[s] set apart for recreation of the public, to promote its health and enjoyment" (Williams v Gallatin, 229 NY 248, 253 [1920]]). If a project has no connection with a park purpose, then no matter "however worthy" the project may be, it cannot proceed without legislative authority because of the encroachment it will pose on parkland (id.). The converse proposition is also true: a project that is connected to a park purpose requires no additional approval by the New York State legislature(Union Sq. Park, 22 NY2d at 654).
In the more than 100 years since Williams, its principles have been reaffirmed and our courts have been called upon to decide whether a proposed [*5]use or project "contribute[s] to the use and enjoyment of the park" that is, whether it is connected to, has or serves a "park purpose" (Williams at 253-254). The public trust doctrine is not an avenue by which to challenge every decision about a park made by the City simply because any individual or the community or disagrees with the municipality's decision. The Parks Department "enjoys broad discretion to choose among alternative valid park purposes" (Union Square Park, 22 NY3d at 655). Only if there is a total lack of park purpose will the courts invoke the public trust doctrine (see Van Cortlandt Park, 95 NY2d at 631-632).
Notwithstanding petitioner's arguments, the record is clear that coastal flooding protection will greatly benefit the Park. Located immediately next to the East River, the Park is vulnerable to coastal flooding, even more so than the communities lying inland to the west. This project is made with the intention of saving the Park from degradation due to surging salt water from the East River during storms that, over time, have increased in ferocity.
Petitioners contend that the principal purpose of the project is construction of a coastal shore floodwall to safeguard the residential developments nearby. They argue that the conclusion of a nonpark purpose is warranted because the work proposed is disproportionate to the work required to preserve the Park. There is no dispute that the project will greatly benefit the nearby communities from the risk of coastal flooding. At its core, however, petitioners' argument is that any project that serves a park purpose cannot serve a dual purpose. Stated differently, that a park purpose is served only if that is the sole objective of a particular project. This is too narrow a reading of the park purpose requirement.
A project that benefits a park as well as other community objectives can still be considered to serve a park purpose under the public trust doctrine. Matter of Friends of Petrosino Sq. v Sadik-Khan, which was affirmed by this Court (42 Misc 3d 226 [Sup Ct, NY County 2013], affd 126 AD3d 470 [1st Dept 2015][Petrosino]) is illustrative. Petrosino involved the installation of a bike share station in Petrosino Square. Supreme Court concluded that the installation was a proper park purpose, because "a bike share station has a direct connection to the important park purpose of bicycle recreation and allows easy access to and further encourages the use of parkland by the public" (Petrosino, 42 Misc 3d at 232). In affirming, this Court agreed that the bike station was "an appropriate incidental use of parkland to the extent it contributes to or facilitates the use and enjoyment of the park" (Petrosino, 126 AD3d at 470). Thus, the bike station in Petrosino not only served a park purpose, but it also benefited New Yorkers who might only come to the park to rent a bike and then leave. Likewise, at bar, even though a coastal flooding protection project will provide communities adjacent [*6]to the Park with flood protection, it will also protect the Park from coastal flooding.
Once it is determined that there is a park purpose, the salutary goal of preventing the alienation of parkland is satisfied. This conclusion flows from the bedrock principle first set forth in Williams, which is that "no objects, however worthy . . . which have no connection with park purposes, should be permitted to encroach upon [parkland] without legislative authority plainly conferred" (Williams v Gallatin, 229 NY at 253 [emphasis added]). The coastal flood protection project has "a connection with park purposes," and therefore, requires no State approval.
Petitioners' arguments that there are better, less intrusive ways, to accomplish coastal flood protection, even if true, do not implicate the public trust doctrine. A difference of opinion as to the best way to improve and protect the Park, does not convert a park purpose into a nonpark purpose (Union Sq. Park, 22 NY3d at 654).
Alternatively, petitioners, relying on Van Cortlandt Park, argue that the lengthy park closures anticipated by the project is itself a type of alienation requiring State approval. Van Cortlandt Park does not support this broad proposition. In Van Cortlandt Park, the City proposed to build a water treatment plant below Van Cortlandt Park, which the parties agreed was a nonpark use (Van Cortlandt Park, 95 NY2d at 627). The issue decided by the Court was whether the City's intent to restore the park after construction exempted a nonpark use from State approval. The Court of Appeals concluded that use of Van Cortland Park for "other than park purposes, either for a period of years, or permanently" was alienation that still required State legislative approval (Van Cortlandt Park, 95 NY2d at 632 [internal quotation marks omitted]). Van Cortland Park does not stand for the proposition that the length of time a project takes in itself determines whether a project is for a park or nonpark purpose. In fact, in, Union Sq. Park Community, a later case, the Court of Appeals held that operation of a restaurant in Union Square Park was not a nonpark use, notwithstanding that the restaurant operator had been offered a 25 year license. Our conclusion in this case, that the expected duration of the Park closure is not in itself dispositive of whether the coastal flood protection project is for a park purpose, is consistent with these Court of Appeals authorities.
We do not discount petitioner's concerns that this project will impose a burden on the surrounding community that houses tens of thousands of residents. We only hold that those concerns are not addressable under the public trust doctrine. The City expects that any burden caused by the project will be rewarded with a rejuvenated East River Park that is well protected from future storm surges, allowing the Park to fulfill its role as a recreational area for many years and future generations.
Accordingly, the judgment of the Supreme [*7]Court, New York County (Melissa A. Crane, J.), entered August 20, 2020 denying the petition to annul a November 14, 2019 vote of the City Council, which modified the Zoning Resolution in order to facilitate the development of the East Side Coastal Resiliency Project, and dismissing the proceeding brought pursuant to CPLR article 78, should be affirmed, without costs.
Judgment, Supreme Court, New York County (Melissa A. Crane, J.), entered August 20, 2020, affirmed, without costs.
Opinion by Gische, J., All concur.
M-3733 - East River Park Action, et. al v City of New York
Motion for a preliminary injunction denied as moot.
Acosta, P.J., Gische, Singh, Scarpulla, Mendez, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: November 30, 2021



Footnotes

Footnote 1: After Superstorm Sandy, FEMA released advisory base flood elevation maps for certain communities affected by the storm. Although these maps have many uses, as relevant here, they show the current flood risk for these communities.

Footnote 2: Petitioners contend this evinces the City's awareness that State approval was required, but the City forged ahead without it. While some of the alternatives in the DSW may have required approval by the State legislature, for the reasons stated in this decision, the "preferred alternative" ultimately pursued by the City does not.

Footnote 3: A berm is a raised area that reduces the water flow that brings with it sludge and sediment and other debris. It also provides some landscape features.

Footnote 4: According to the City, the earlier design alternative considered was not feasible because it called for nighttime construction to avoid daytime FDR closures, the work would be loud, and the berms would be built on top of high-voltage transmission lines requiring special safety measures. The revised plan allows construction equipment to be delivered to the site by water, reducing truck traffic through the community. The City also contends that in the long run the original proposal would have done little to protect the Park from future flooding, yet it would have been expensive to implement.